Page 1

```
 1                 IN THE UNITED STATES DISTRICT COURT

                   FOR THE NORTHERN DISTRICT OF ILLINOIS

 2                         EASTERN DIVISION

 3

 4         ROBERT SAFFOLD,                )

                                          )

 5                    Plaintiff,          )

                                          )

 6              vs.                       )  No. 18-cv-3301

                                          )

 7         ILLINOIS DEPARTMENT OF         )

           CORRECTIONS; WEXFORD HEALTH    )

 8         SOURCES, INC.; DANIEL ARTL;    )

           RANDY PFISTER;                 )

 9         CHRISTOPHER MEDIN; JOHN        )

           DOE #1; JOHN DOE #2; GHALIAH   )

10         OBAISI, Independent Executor   )

           of the Estate of              )

11         SALEH OBAISI,                  )

                                          )

12                    Defendants.         )

13

14             The discovery deposition of ROBERT SAFFOLD,

15       taken before Christina Basis-Prinzi, Certified Shorthand

16       Reporter, Registered Professional Reporter, taken pursuant to

17

18       the Federal Rules of Civil Procedure thereof pertaining to

19

20       the taking of depositions at 16830 South Broadway,

21

22       Crest Hill, Illinois 60403, commencing on June 17, 2019,

23

24       at 10:37 a.m.
```

Veritext Legal Solutions

**EXHIBIT A**

1    APPEARANCES:

2           LAW OFFICES OF LAWRENCE V. JACKOWIAK
             LAWRENCE V. JACKOWIAK
3           111 West Washington Street, Suite 1500
             Chicago, Illinois 60602
4           Phone:  (312) 795-9595
             Email:  ljackowiak@jackowiaklaw.com
5
                    On behalf of the Plaintiff.
6
             CASSIDAY SCHADE, LLP
7           EDWARD A. KHATSKIN
             222 West Adams Street, Suite 2900
8           Chicago, Illinois 60606
             Phone:  (312) 641-3100
9           Email:  ekhatskin@cassiday.com
10                  On behalf of Wexford Health Sources, Inc. and
                    Saleh Obaisi.
11
             OFFICE OF THE ILLINOIS ATTORNEY GENERAL
12          NICHOLAS V. ALFONSO
             100 West Randolph Street, 13th Floor
13          Chicago, Illinois 60601
             Phone:  (312) 814-7201
14          Email:  nalfonso@atg.state.il.us
15                  On behalf of Daniel Artl, Randy Pfister, and
                    Christopher Medin.
16
17                          *    *    *    *    *    *
18
19
20
21
             Christina Basis-Prinzi
22          Certified Shorthand Reporter and
             Registered Professional Reporter
23          CSR No. 084-001769
             One North Franklin Street, Suite 3000
24          Chicago, Illinois 60606
             Phone:  (312) 442-9087

Page 3

1                          I N D E X

2

3

4       ROBERT SAFFOLD

5       Examination By Mr. Khatskin                          4

6       Examination By Mr. Alfonso                         131

7       Examination By Mr. Jackowiak                       170

8       Further Examination By Mr. Alfonso                 171

9       Further Examination By Mr. Khatskin                172

10

11

12      Exhibit Number 1      UIC Medical Records            30

13      Exhibit Number 2      Medical Special Services        64

14                            Referral and Report Form

15      Exhibit Number 3      Medical Records               103

16      Exhibit Number 4      Emergency Grievance July 13,   135

17                            2016

18      Exhibit Number 5      Medical Permit                145

19

20

21

22

23

24

```
                                          Page 4
 1              MR. KHATSKIN:  Would you swear in the witness?
 2                    (Witness affirmed.)
 3              THE WITNESS:  Yes, ma'am.
 4                          ROBERT SAFFOLD,
 5    called as a witness, having affirmed, was examined and
 6    testified as follows:
 7                          EXAMINATION
 8    BY MR. KHATSKIN:
 9         Q    Mr. Saffold, my name is Edward Khatskin.  I
10    represent Dr. Obaisi's estate.  As you're aware, he's
11    deceased.  I represent his estate.  Also here is Nick
12    Alfonso.  He's from the attorney general's office.  He's
13    going to be representing the IDOC defendants.
14         A    Okay.
15         Q    Have you ever had your deposition taken?
16         A    This one, no.  I've had one before.
17         Q    How many depositions have you given in the past?
18         A    I've had one.
19         Q    All right.  That, I'm assuming, is in a previous
20    case?
21         A    Yes.
22         Q    What was that case?
23         A    People vs. The Sheriff of Winnebago County.
24         Q    So somebody was prosecuting the sheriff for a
```

Page 5

1   crime?

2       A    No.  When I caught this case, they -- they

3   violated my rights.  And I put it in a lawsuit against the

4   sheriff there at the county.  Gasparini, I think, is his

5   name.

6       Q    So you sued the sheriff?

7       A    Yes.

8       Q    All right.  And what was the result of that case?

9       A    We got dismissed because I wasn't injured.

10      Q    So you lost the case basically?

11      A    Yes.

12      Q    All right.  And is that the only other lawsuit you

13  filed besides this one?

14      A    No.

15      Q    How many lawsuits have you filed?

16      A    This is the third one -- three.

17      Q    This is the third lawsuit?

18      A    Yes.

19      Q    What is the one lawsuit that we haven't talked

20  about yet?

21      A    The one against Dr. Ghosh and the IDOC.

22      Q    Is that Saffold vs. Ghosh?

23      A    When I ended up getting sick down here, just out

24  of the blue.

Page 6

```
 1        Q      And?

 2        A      I ended up getting sick down here, and I almost

 3   died.

 4        Q      And you sued Dr. Ghosh?

 5        A      Yes.

 6        Q      Since you've done a deposition before, I'm sure

 7   people have explained some ground rules to you, but let's,

 8   kind of, go over them again.  My biggest rule, number one, if

 9   you don't understand a question that I ask, do not answer.

10   Does that make sense?

11        A      Yes.

12        Q      Sometimes I ask terrible questions --

13        A      All right.

14        Q      -- I understand that.  If you don't get it, don't

15   answer it.  I'm not kidding.  Just don't answer.

16        A      Right.

17        Q      If you do answer, then can I assume you understood

18   what I asked you?

19        A      Right.  If I don't understand, I'll ask you again.

20        Q      You can ask me again, but I don't want you to

21   answer.  Here's the one thing that I don't want to happen:  I

22   don't want you to later say, I didn't understand.  Does that

23   make sense?

24        A      Yes.
```

Page 7

```
 1        Q      Are you under the influence of drugs or alcohol or

 2    anything else like that that could impact your ability to

 3    remember today?

 4        A      I mean, I take medication.  That's it.

 5        Q      Okay.  What kind of meds do you take?

 6        A      Methotrexate.

 7        Q      What is that?

 8        A      It's a medication dealing with my disease that I

 9    have.

10        Q      All right.  You have many.  So is that

11    antipsychotic?  Is that something that affects your --

12        A      No, it's not psychotic.

13        Q      It has nothing to do with mental health?

14        A      Right.

15        Q      Do you feel like you know the difference between

16    truth and not truth right now?

17        A      Yeah, I know the difference between truth and not

18    truth.

19        Q      Do you feel like your memory is not impacted

20    today?

21        A      No.

22        Q      It's not impacted?

23        A      No, it's not impacted.

24        Q      That's all -- I was trying to make sure that you
```

Page 8

1    in a mental state where you can give a deposition.

2         A    Yes.

3         Q    All right.  Did you handwrite the original

4    complaint in this case?

5         A    No.  I had someone go over it with better

6    handwriting.

7         Q    I did notice.  It was very nice penmanship.

8         A    I appreciate that.

9         Q    But you read all of it?

10        A    I wrote the original one, but my handwriting is

11   sloppy.  So I had somebody go over it.

12        Q    So the complaint that was submitted to the Court,

13   did you read it to make sure that everything in there was

14   truthful?

15        A    Yes.

16        Q    Did you understand that you have to be truthful

17   with the Court when you submitted it?

18        A    Yes.

19        Q    So all of the factual things, the stuff you say in

20   the complaint, we can assume that you intended that to be

21   true?

22        A    They are true.

23        Q    Okay.  What's your date of birth?

24        A    8/25/68.

```
                                                        Page 9
```

1          Q      All right.  Where were you born?

2          A      Jackson Park -- Jackson Park Hospital, Chicago,

3     Illinois.

4          Q      And did you grow up in Chicago?

5          A      No.  My mom passed away when I was four months

6     old, so my grandparents came and got me.  And I was raised in

7     Rockford, Illinois.

8          Q      So Rockford is where you were raised?

9          A      Yes.

10         Q      Did you go to high school?

11         A      Yes.

12         Q      In Rockford?

13         A      Yes.

14         Q      Did you graduate?

15         A      No.  I left my sophomore year to go to Job Corps

16    in Golconda, Illinois.

17                THE COURT REPORTER:  In what Illinois.

18                THE WITNESS:  Golconda.

19    BY MR. KHATSKIN:

20         Q      So besides sophomore-level education while you

21    were out, I'm assuming, did you get a GED as --

22         A      I have my GED since '86.

23         Q      '86, GED.  Where did you get your GED?

24         A      At Golconda Job Corps Center.

Page 10

```
 1        Q      So they provided additional training?

 2        A      Yes.

 3        Q      When were you first incarcerated?

 4        A      1990.

 5        Q      Okay.  What was that for?

 6        A      For boot camp aggravated battery on police

 7   officers.  I went to Dixon Springs Impact Incarceration

 8   Program and went to boot camp.  And then they kicked me out

 9   of there.  And I went to Menard and then Shawnee and then

10   down to Danville.

11        Q      So that was one sentence?

12        A      Yes.

13        Q      When were you out on that sentence?

14        A      When was I out?

15        Q      (Indicating.)

16        A      In '92.

17        Q      So you did two years, bounced around a bunch of

18   prisons in Illinois?

19        A      Yes.

20        Q      When was your next sentence?

21        A      '93.

22        Q      All right.  What was that for?

23        A      It was for simple robbery.

24        Q      All right.  How many years did you do on that?
```

```
                                                Page 11

 1       A      18 months.

 2       Q      Do you remember where?

 3       A      Centralia.

 4       Q      What was next?

 5       A      That was it.  This is next.

 6       Q      When was "this"?

 7       A      1996.

 8       Q      All right.  This is for murder?

 9       A      Yep.

10       Q      And I'm assuming it's life?

11       A      Yes.

12       Q      Do you have any medical training?

13       A      No.

14       Q      Not at all?  Not barely?

15       A      When you say "training," I mean, I know about

16    medical, but I don't have any training.

17       Q      Okay.  I wanted to -- good.  I wanted to

18    distinguish that.  So you don't have any formal training, but

19    you said you know about medical.  How do you know about

20    medical?

21       A      Because my daughter's mom who I've known for

22    18 years, she was a nurse at the hospital when I lived with

23    her.  And her grandmother was also a nurse at the hospital.

24       Q      All right.
```

Page 12

1      A      So I've been dealing with her for years.

2      Q      So you know several nurses?

3      A      Yes.

4      Q      I'm married to one.

5      A      Okay.  And my daughter is an RN too.

6      Q      So your medical training or your medical knowledge

7   comes from the nurses that you familiar with?

8      A      That and experience.

9      Q      Experience.  Have you read any medical books?

10     A      No.  Besides Merck's Medical Dictionary, no.

11     Q      The Merck's Medical Dictionary?

12     A      Yeah.

13     Q      That would basically define terms?

14     A      It defines terms and everything and the

15   medications you take and the symptoms you're going through.

16     Q      An encyclopedia?

17     A      Yes.

18     Q      Are you familiar with the inmate handbook?

19     A      Am I familiar with it?

20     Q      Yes.

21     A      The AR-504?

22     Q      The handbook that you receive whenever you enter a

23   prison facility?

24     A      I mean, it's been 22 years ago, but, yeah, I'm

Page 13

1    familiar with it.

2          Q     Do you have a copy?

3          A     No.

4          Q     Were you given a copy at some point in time?

5          A     Yeah, when I first came in 1998.

6          Q     And you signed for it?

7          A     I can't even remember.

8          Q     Okay.  Did you read it?

9          A     Yes, for the -- for the most part.

10         Q     Okay.  Are you familiar with what is called the

11   sick-call process or how you're supposed to request medical

12   care?

13         A     Well, back then, you could just tell the nurse

14   that I need to go to sick call.  And they'd let you out, and

15   you go down there.  So since then, the situation has changed.

16   Are you referring to how they practiced it in the early 2000s

17   or how they practice it right now?

18         Q     Well, let's fast-forward to, say, 2016.  How did

19   they do it in 2016?

20         A     How did they do it in 2016?

21         Q     Yes.

22         A     When you go out of your cell, there's a sheet of

23   paper on the wall and/or you can talk to a nurse.  And when

24   the nurse comes by, you can tell her, Hey, sign me up for

Page 100

1      A      You know that.

2      Q      Okay.  Then it says -- let's see -- then it

3  says -- the medical record that you're choosing to believe

4  also says, Still lifting weights, right?

5      A      Yes.

6      Q      And then let's go to Page 88.  We can review that

7  since you brought this up again.  And the pain that she's

8  associating is -- the left and right shoulder pain is a

9  likely combination of arthritis and tendinitis, right?

10     A      Right.

11     Q      Now, let me ask this question:  Do you have any

12 verifiable medical evidence to support your allegation in

13 Paragraph 66?

14     A      I have me.

15     Q      Okay.

16     A      I have me and my experience, what I've gone

17 through.

18     Q      All right.  Got you.  Can I then, kind of -- as I

19 understand you, sir, the only current medical evidence that

20 connects the cuffing incident to your pain saying that's

21 causally related is coming from you, fair?

22     A      Yes.

23     Q      No medical records you're aware of that have

24 backed up that theory?

Page 101

1    A    Well, the medical records -- when they ask what

2   happened, I tell them what happened.  I think she wrote that

3   down that I was handcuffed for four hours on there.

4    Q    She did.

5    A    Did she write that down?

6    Q    Yes.  That's in --

7    A    Why won't you take her word now on that?

8    Q    That's in the subjective portion, sir.  Do you

9   understand how medical records work?

10   A    No.  I'm new to this.

11   Q    There's the subjective portion.

12   A    Okay.

13   Q    That's what you tell her.  She writes down what

14  you say.  Then there's the subjective portion (sic) which is

15  the middle stuff we didn't even get through.  That's, like,

16  all of her observations --

17        MR. ALFONSO:  You said "subjective."

18        MR. JACKOWIAK:  Objective.

19        MR. KHATSKIN:  I'm talking about the objective.

20  BY MR. KHATSKIN:

21   Q    Objective is her observations, her physical

22  examination, any diagnostics she's doing --

23   A    Right.

24   Q    Then that's subjective.  Then it's objective.

Page 102

1    Then there's this thing called assessment.

2         A    Right.

3         Q    That's a diagnosis.  And then there's this thing

4    called plan.  So plan is, like, get physical therapy.  Let's

5    prescribe medication.  It's called a SOAP note.  It's how all

6    medical records are kept.

7         A    Correct.

8         Q    All right.  So the part when you say "handcuffed

9    for four hours," that's the subjective portion?

10        A    Right.  That's from me.

11        Q    That's from you?

12        A    Right.

13        Q    Then she takes all that information and what her

14   observations are and then she comes up with an assessment or

15   a diagnosis?

16        A    Right.

17        Q    And her diagnosis is his shoulder pain is caused

18   by arthritis and tendinitis, even though you told her that

19   you were handcuffed?

20        A    Yes.

21        Q    She took that into consideration, but her

22   diagnosis was pain caused by arthritis and tendinitis.

23        A    Got it.

24        Q    My question to you, sir, is, has a doctor

```
                                                    Page 103
 1    mentioned in a medical record that your shoulder pain was

 2    caused by you being handcuffed?

 3         A    No.  I haven't talked to no doctor.

 4         Q    Got it.  I just want to briefly go through the

 5    waist -- the different permits that you have.

 6         A    Right.

 7              MR. KHATSKIN:  Then I think I'll be done.

 8              Off the record.

 9                   (Proceedings were had off the record.)

10              MR. KHATSKIN:  This is going to be Exhibit 3.

11                   (Exhibit Number 3 was marked for

12                    identification.)

13    BY MR. KHATSKIN:

14         Q    This is Exhibit 3.  Do you see there are page

15    numbers on the top.  So this is a portion of the medical

16    records.  We're going to produce this to your counsel just so

17    he has the right Bates numbering.  We're going to, kind of,

18    go back.

19              Page 892, let's start with that one.  These are

20    your medical permits, sir, right?

21         A    Yes.

22         Q    Do they look familiar?

23         A    Yes.

24         Q    This one is dated 5/17/2016, right?
```

```
                                                        Page 104

 1        A     Yes.

 2        Q     That's right immediately before the -- before the

 3    incident at issue, correct?

 4        A     Yes.

 5        Q     And this one does not have a waist chain permit,

 6    correct?

 7        A     Correct.

 8        Q     Okay.  It does have low bunk and low gallery?

 9        A     Yes.

10        Q     And ice, yes?

11        A     Yes.

12        Q     And this one was prepared by Dr. Obaisi.  Do you

13    remember?

14        A     Yes.

15        Q     So Dr. Obaisi, obviously, determined that you

16    needed certain permits but not others, correct?

17        A     Right.

18        Q     Let's go to the next page.  This is 891.  This is

19    a permit from December 9, 2015.  This one just seems to be

20    for shower -- medical daily shower, right?

21        A     No.

22        Q     No?  What does it say?

23        A     You said it "just seems to be."

24        Q     Oh, sorry about that.  It's also ice twice a
```

Page 105

1    day --

2         A     Oh, yeah.

3         Q     -- and medical shower?

4         A     Yes.

5         Q     All right.  And that's dated December 9, 2015,

6    yes?

7         A     Yes.

8         Q     Let's go to the next one.  This is Page 874, for

9    the record.  This is a medical permit, again by Dr. Obaisi,

10   correct?

11        A     Yes.

12        Q     July, I think, it's 31, 2014?

13        A     Yes.

14        Q     All right.  That was for low bunk, low gallery.

15   It has that medical shower?

16        A     Yes.

17        Q     And it has a waist chain permit?

18        A     I can't even see it.

19        Q     It's checkmarked.

20        A     Okay.

21        Q     Right there.

22        A     Yes, I see it.

23        Q     All right.  So is that one of the -- and that one

24   is -- was going to expire, I believe, in -- is that 2 or 7.

Page 114

```
1        Q     Sure.

2        A     Because he said that it has to go through the

3    warden to get the waist chain --

4        Q     Okay.

5        A     -- for security reasons.

6        Q     Okay.  That's what he said?

7        A     Yes, that's what he said.

8        Q     And so he refused to give you a waist chain permit

9    on that date?

10       A     I haven't had one all this time.

11       Q     My question is, on that date, he didn't --

12       A     Yes, he refused to give me one.

13       Q     And he told you, Sorry, it has to go through the

14   warden?

15       A     Yes.

16       Q     To your knowledge, did he go and talk to the

17   warden afterwards?

18       A     No.  Some- -- something had happened with the --

19   with an escape or something like that or a guy trying to

20   escape out of the van or something like that.  And the warden

21   had came in and said he was reviewing everybody's permit.

22   Everybody had who had waist chain permits and all of that

23   stuff.  It put a hold on everybody's stuff.  He said that he

24   couldn't give it to me unless he went through the warden.
```

Page 115

1     Q     Okay.  Did he go through the warden?

2     A     Not to my knowledge because I didn't get one.

3     Q     You didn't get one?

4     A     Right.

5     Q     Did he go to the warden -- well, he died in

6  December, right?

7     A     I'm assuming he died.

8     Q     December of '17?

9     A     Yes.

10    Q     So between August 2017 and December, you never got

11  your waist chain permit?

12    A     No.

13    Q     Okay.  So let's flip to Page 370.  So this is

14  dated October 10, 2017?

15    A     Yes.

16    Q     I see you have a waist chain permit?

17    A     Yes.

18    Q     You told me 25 seconds ago that you didn't?

19    A     I didn't know the date was this.

20    Q     Okay.  And right there it says -- you see there's

21  a comment that says, Waist chain on writs again.  Dr. Obaisi

22  apparently did say --

23    A     I've always had waist chains on writs.  Whenever I

24  got out, that's what I'm usually supposed to have, a waist

1    chain.  I'm not supposed to be in the box.

2         Q    Again, I'm talking about the paperwork and the

3    paperwork that we went through for quite a while now actually

4    doesn't say that, Always waist chain on writs.  There are

5    many times when you don't have a waist chain permit?

6         A    Right.

7         Q    Okay.  So why are you suing Dr. Obaisi?

8         A    I'm suing Dr. Obaisi because he had full knowledge

9    of my injury, and he knew --

10        Q    Sir, when you say "injury," do you mean your

11   condition?

12        A    Yes.  He had full knowledge of that.  And he knew

13   about the pain I was going through because he would ask me

14   about the pain I was going through.  He knew about the pain I

15   was going through because the rheumatologist would tell him

16   that he was -- that I was in pain every time.  Instead of

17   taking --

18        Q    Hold on a second.  When you say a rheumatologist

19   would tell him, did you witness a conversation between

20   Dr. Obaisi and the rheumatologist?

21        A    Really?

22        Q    I'm asking you.

23        A    Paperwork.  Paperwork.

24        Q    Through paperwork?

Page 117

1          A      Yes, through paperwork.

2          Q      So your expectation is that Dr. Obaisi would read

3     the paperwork that the rheumatologist --

4          A      The special service report goes to them.

5          Q      Got it.  And the paperwork from the medical

6     records -- from the UIC?

7          A      Yes.

8          Q      -- these records too?

9          A      That's what I'm talking about.

10         Q      So the records contained notations of you working

11    out, weightlifting, telling the rheumatologist that you don't

12    have a lot of issues?  All of these records would go to

13    Dr. Obaisi, fair?

14         A      If that's how you want to say it, yeah.

15         Q      Well, it's not how I say it.  As your lawyer

16    points out, the record speaks for itself.  So as the record

17    speaks for itself, that's what Dr. Obaisi would know, right?

18         A      Yes.

19         Q      Got it.  And you're suing him because with all

20    that knowledge that is contained in UIC's medical records, he

21    refused to give you a waist chain permit?

22         A      I'm suing him for numerous reasons.

23         Q      Okay.  Let's go back to the first amended

24    complaint that puts me on notice of why you're suing

1    Dr. Obaisi.  Please tell me in this complaint, why are you

2    suing Dr. Obaisi?

3         A     Where is all of the Obaisi stuff so I can read it?

4               MR. KHATSKIN:  Can we go off the record?

5                    (Proceedings were had off the record.)

6               MR. KHATSKIN:  Back on the record.

7    BY MR. KHATSKIN:

8         Q     Why are you suing my doctor?

9         A     Because, basically, he's been -- he's been my

10   doctor since I had the undifferentiated connective disease

11   disorder.

12        Q     Yeah.

13        A     And he knew about the symptoms as far as -- as far

14   as when the antibodies in my body produced too much protein.

15   And once they coagulate up, my body goes below body

16   temperature.  He knows that my body formed blood clots --

17        Q     Yeah.

18        A     -- and cut off the oxygen and the blood flow.  I

19   would prefer for my body -- not to have blood clots in my

20   body or have a stroke.  I have to have the full circulation

21   through there.  So at first, he was giving me the waist

22   chains and medical permit.  He knew of my injury.

23               When Dr. Volkov sent the special service report --

24   from her sending everything from the outside hospital, he

1    knew that my shoulder had limited -- when he asked me about

2    how I was feeling, I told him about my shoulder was hurting,

3    and I told him what was going on with my body.  He knew about

4    all of that.  And instead of taking the proper steps to get

5    me a waist chain permit and everything that I needed, he

6    didn't do that.  And he's the medical director responsible

7    for the safety and well-being of my person while I'm kept

8    here at Stateville Correctional Center.

9            If I have a chronic illness, an illness that lasts

10   longer than six months, he's supposed to take care of you.

11   I'm not asking for much.  I just don't want to be hurting

12   every time I go somewhere.  I don't want to be subjected to

13   cruel and unusual punishment.

14           Those are a few reasons right there off the bat.

15   And then sometimes Brian (sic) actually acted like he don't

16   -- he didn't have the capacity to get it done on his own,

17   saying that he would have to go through other people when he

18   was the medical director.

19           I'm sorry.  Do you want me to stop?

20      Q    No.  No.  No.  I'm listening.

21      A    I don't want to -- I don't want to keep on talking

22   while you're reaching down --

23      Q    She's taking everything down.  Go ahead.

24      A    That's the main reasons right there.  I feel that

Page 120

1    this incident could have been prevented with me having a

2    waist chain, instead of having my hand jammed behind my back.

3         Q    So let me unpack that a little bit.

4         A    Okay.

5         Q    What I was trying -- and I appreciate all of that,

6    sir.  What I'm trying to figure out is you're suing

7    Dr. Obaisi essentially for multiple failures that led to him

8    not giving you a waist chain permit?

9         A    I'm suing Dr. Obaisi because he was the medical

10    director.  He was my doctor during all this time.  And he

11    knew about my injuries ever since I got this disease.

12         Q    Correct.  What I'm trying to unpack -- just to

13    simplify it, because I'm a fairly simple guy --

14         A    You just asked me, and I just answered.

15         Q    What I'm saying is he should have done something

16    on a date and he didn't do?

17         A    He should have did something a long time ago, and

18    he didn't do it.

19         Q    Okay.  And that "something" is to give you a waist

20    chain permit?

21         A    Yeah, among other things.

22         Q    When you say "among other things," that's what I'm

23    entitled to find out.  What "other things" are you talking

24    about?

Page 121

1        A       I've been going through this since 2010.

2        Q       You have a chronic condition, sir.  You're going

3    to be going through this the rest of your life?

4        A       Meaning what?

5        Q       Your connective tissue disease and everything

6    else.

7        A       Okay.  Meaning that the medical director -- I'm

8    sure he knows about the chronic condition, right?  He was

9    supposed to prevent me from being injured further with my

10   condition, and he didn't do that.

11       Q       Okay.

12       A       He didn't do that at all.

13       Q       And what I'm trying to go back to is, we're still

14   talking about this waist chain permit, right?

15       A       Actually we were talking about Dr. Obaisi.  You

16   asked me why I was suing him.

17       Q       Yeah.  You're suing Dr. Obaisi for failure to give

18   you a waist chain permit --

19       A       Yeah, among other things.

20       Q       -- which resulted in you being cuffed behind your

21   back --

22       A       Yes.

23       Q       -- which resulted allegedly in an injury?

24       A       Yeah.  I feel that Dr. Obaisi being the medical

Page 122

1  director -- with me being his patient, he has a Hippocratic

2  Oath to make sure that I'm not --

3      Q    You're not suing him for the failure of a

4  Hippocratic Oath, sir.  You're suing him for a constitutional

5  violation.  So my question is, how did he violate your

6  constitutional rights by not giving you a waist chain permit?

7      A    He knew about my injury, and he didn't prevent me

8  from further being injured.

9      Q    Got it.  And so he did not prevent you from

10  further being injured?

11      A    You just asked me the question, and I answered it.

12      Q    Other reasons you're suing him for?  Are there

13  other reasons?

14      A    Are there other reasons?

15      Q    Yes.

16      A    I just explained to you the "other reasons."  I

17  told you -- I told you that he's been my doctor, right?  With

18  him knowing about my chronic illness, he was supposed to take

19  all the steps that he could to prevent me from going through

20  pain, prevent me from any kind of harm.

21      Q    Let me stop you right there.  When you say

22  "prevent" you from going through pain, are you saying from

23  2010 when you got the chronic illness, he was supposed to --

24      A    Ever since he's been the medical director here.