044887/19344/MHW/EAK

# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ROBERT SAFFOLD, <br><br> Plaintiff, <br><br> v. <br><br> ILLINOIS DEPARTMENT OF CORRECTIONS, WEXFORD HEALTH SOURCES, INC., DANIEL ARTL, RANDY PFISTER, CHRISTOPHER MEDIN, JOHN DOE #1, JOHN DOE #2, GHALIAH OBAISI, Independent Executor of the Estate of SALEH OBAISI, <br><br> Defendants. | No. 18 cv 3301 |

## DECLARATION OF MARLENE HENZE, M.D.

I, MARLENE HENZE, M.D., being first duly sworn upon my oath state that I have either personal knowledge or knowledge and opinions obtained through review of medical records of the facts set forth herein, that I am competent to testify, and that if called to testify, would state as follows:

## BACKGROUND

1. I am a physician licensed to practice medicine in Illinois. I obtained my medical degree at Southern Illinois University School of Medicine in 1993. I then completed a residency at MacNeal Hospital in Berwyn, Illinois in 1996. Afterwards, I worked as a physician employee and a solo practitioner in a family practice until 2012. I was a hospitalist from 2012 to 2017.

2. I have worked in correctional medicine since the end of 2017.

3. In late 2017, I was hired by Wexford Health Sources, Inc., ("Wexford") as a Medical Director at Sheridan Correctional Center. On October 8, 2018, I transferred to Stateville Correctional Center ("Stateville") as the Medical Director.

EXHIBIT B

4. While working at Stateville, I have become familiar with medical records authored by Dr. Saleh Obaisi and other medical providers. I am familiar with his signature and can identify, interpret and opine about his handwritten medical notes.

5. Dr. Obaisi and myself have both treated Plaintiff Robert Saffold. I am familiar with Mr. Saffold's medical chart and treatment history. I have reviewed Mr. Saffold's medical records in order to prepare this Declaration.

6. As a physician, and most currently, in my position as a Medical Director, I regularly review medical records prepared by other medical professionals both inside Stateville's Healthcare Unit and outside medical providers. I have significant training and experience in reviewing medical records prepared by other medical providers, and I often rely on medical records prepared by other medical professionals in order to perform my duties as a medical professional which include, but are not limited to tracking patients' treatment, formulate diagnosis, and prepare and modify treatment plans.

## Medical Practice at Stateville

7. I am employed by Wexford Health Sources, Inc. Wexford is a private corporation that has contracted with the State of Illinois through the Illinois Department of Corrections ("IDOC") to provide certain medical services to inmates at various correctional facilities, including Stateville.

8. Stateville's Healthcare Unit operates a mixed staff. Some staff members work for Wexford and others work for the IDOC.

9. During all relevant times, Plaintiff was housed at Stateville.

10. Plaintiff has degenerative medical conditions which have been present since at least 2010. Plaintiff has Undifferentiated Connective Tissue Disease (a type of autoimmune disease), Arthritis, Raynaud's Disease (a condition that restricts blood vessels and blood flow

usually in the fingers and toes), and Synovitis (inflammation of the tissues that line a joint). Pertaining more specifically to his shoulders, Plaintiff has been diagnosed with arthritis of the glenohumeral joint and rotator cuff tendonitis. Arthritis of the glenohumeral joint is typically a chronic and degenerative condition. It can be managed, but not cured. With passage of time, however, the progression of arthritis in the shoulder could lead to the need for shoulder replacement surgery.

11. According to Plaintiff's medical records, since as early as 2010, Plaintiff has been regularly going to the Rheumatology Clinic at UIC Hospital ("UIC") and treating with Dr. Suncica Volkov. Dr. Volkov is a Rheumatologist.

12. To further alleviate Plaintiff's discomfort due to his medical conditions, Plaintiff, at different times, has received various medical permits from different Medical Directors at Stateville. Generally speaking, a medical permit grants an inmate certain privileges otherwise not permitted to other inmates. By way of example, medical permits: (1) allow inmates to reside on a low gallery of a cell house (thereby alleviating the need to climb stairs); (2) allow inmates to sleep on a lower bunk in a cell (thereby eliminating the need to climb on a top bunk); or, (3) allow for a modification from the normal shackling procedures (sometimes inside the prison and sometimes only on extended travel outside the prison). Other permits allow inmates with ambulation deficits to walk in a slow walk line, utilize crutches or eat meals in their cell. Other permits allow inmates additional showers, ice in their cells, additional toilet paper, or special shoes.

13. A waist chain permit allows for a non-standard restraint to be applied to an inmate. Regular restraints in a prison closely resemble handcuffs. When these restraints are utilized appropriately, an inmate is restrained with both hands behind his back. This hand

positioning is uncomfortable (albeit not medically dangerous or painful), and most inmates do not like being restrained in that fashion. In a very specific set of medical circumstances, an inmate may require a waist chain permit. A waist chain restraint permits an inmate to be restrained without placing their hand behind their back. A leather restraint is another type of restraint used to control inmates without placing their hands behind their backs.

## **RELEVANT MEDICAL HISTORY**

14. On July 20, 2012, Dr. Obaisi issued Plaintiff low bunk and low gallery permits for one year. Additionally, Plaintiff was issued a "glove" permit. (MR 851). The glove permit was due to Plaintiff's Raynaud's disease which can cause extremities (like fingers) to get very cold. On August 17, 2012, the gloves permit was upgraded to two (2) gloves. (MR 855). On July 16, 2013, Plaintiff's gloves permits and low bunk/low gallery permits were renewed for another year. (MR 859).

15. Dr. Obaisi on July 15, 2013, held a Collegial Review conference for Plaintiff to be seen as a follow up at UIC Rheumatology Clinic. The request was approved. (MR 483).

16. On September 26, 2013, Dr. Obaisi issued Plaintiff low bunk, low gallery, and waist-chain permits for one year. (MR 862). Dr. Obaisi also issued a gloves permit for cold weather. *Id.* The corresponding progress note for the same date states that Plaintiff has Undifferentiated Connective Tissue Disease, and notes that Plaintiff is taking various medications (Prednisone, CellCept, Nifedipine). (MR 403).

17. On February 19, 2014, Dr. Ann Davis re-issued the same permits that were issued on September 26, 2013 until August 19, 2014. (MR 867). Dr. Davis also issued a permit for an additional roll of toilette paper. *Id.*

18. On March 14, 2014, Dr. Olga Vila saw Plaintiff at UIC Hospital's Rheumatology Clinic as a follow-up. Plaintiff reported that his joint pains have largely improved, but

4

complained about pain in the second finger of his right hand. (UIC 1239). The doctor noted that Plaintiff was doing well on Mycophenolate Mofetil ("MMF"), a drug used to treat connective tissue disease, and the drug was continued. (UIC 1237). Plaintiff received a Cortisone injection into the second finger of his right hand (Cortisone is used to relieve pain and inflammation). (UIC 1236). After a physical examination, the doctor noted that Plaintiff had a full range of motion without effusion (an abnormal collection of fluid in the hollow spaces of the body) in both of his shoulders, knees and elbows. (UIC 1239).

19. On May 13, 2014, Dr. Obaisi issued Plaintiff a permit for medical showers for one year. (MR 871). On June 12, 2014 the shower permit was amended to include three showers per week. (MR 873).

20. On July 31, 2014, Dr. Obaisi re-issued Plaintiff low bunk, low gallery, and waist-chain permits for one year, and increased the medical showers to four per week. Plaintiff also received an additional roll of toilet paper per week and gloves in cold weather. (MR 874).

21. On July 31, 2014, Dr. Obaisi requested another follow up appointment at UIC Hospital's Rheumatology Clinic. (MR 486). The follow up appointment was approved on August 4, 2014. (MR 485).

22. On March 3, 2015, Plaintiff was seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (UIC 1232). Plaintiff complained about joint pain in his hands (which was worse in the right hand), wrist and knees. *Id.* Plaintiff was noted to be taking Procardia for Raynaud's disease, Lisinopril (high blood pressure medication) and Aspirin. *Id.* Plaintiff was also prescribed Methotrexate ("MTX") which is a medication used to treat Rheumatoid Arthritis. *Id.* Plaintiff's MMF was discontinued because Plaintiff was experiencing side-effects and wanted to try other medications. *Id.* After a physical examination, Dr. Volkov

noted that Plaintiff had decreased abduction in his shoulders, his knees had a full range of motion and there was no effusion. (UIC 1233). Dr. Volkov requested a follow-up appointment (no timeframe) (UIC 1234). Abduction refers to arm movement away from the middle of a patient's body, as illustrated in the picture below. Decreased abduction has no bearing, in a medical context, to a patient's ability or tolerance to being handcuffed behind his back.



23. On April 1, 2015, Dr. Obaisi requested another follow up appointment at UIC Hospital's Rheumatology Clinic. (MR 491). The follow up appointment was approved on April 7, 2015. (MR 490).

24. On May 19, 2015, Plaintiff was seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (UIC 1228). He continued to experience Raynaud's disease, without ulcerations. Plaintiff was experiencing decreased abduction in both shoulders. The decreased abduction was worse on the left. (UIC 1229). Plaintiff also complained about joint pain which was worse in the right hand, left shoulder and right knee. Plaintiff's left shoulder pain was diagnosed as likely caused by arthritis of the glenohumeral joint and rotator cuff tendonitis. He was continued on Procardia (used to treat Raynaud's) Lisinopril and Aspirin. (UIC 1231). Plaintiff also received a steroid injection into his left shoulder and left knee. Plaintiff was advised not to do heavy lifting for the next seven to ten days after the shoulder cortisone injection due to

concern for tendon tear. *Id.* Dr. Volkov requested a follow-up appointment in three months. (UIC 1231).

25. On June 1, 2015, Dr. Obaisi requested another follow up appointment at UIC Hospital's Rheumatology Clinic. (MR 501), and a referral for onsite physical therapy (MR 500). The follow up appointment at UIC was approved on June 9, 2015. (MR 499).

26. On July 6, 2015, Plaintiff was seen by Dr. Obaisi stating that he was feeling well and he was seen by Rheumatology. Dr. Obaisi found no acute changes in Plaintiff's condition. There are no notations regarding requests for a waist-chain permit in the record. (MR 443).

27. On August 4, 2015, Plaintiff started participating in physical therapy. He was seen by Jose Becerra who is a physical therapist at Stateville. Plaintiff was treated for pain in his shoulder and knee. (MR 445).

28. Plaintiff then attended physical therapy sessions on August 13, 2015 (MR 447), August 17, 2015, *Id.* August 20, 2015 (MR 448), September 10, 2015, September 15, 2015, September 22, 2015, (MR 452), September 24, 2015, (MR 453), September 28, 2015, and October 1, 2015 (MR 454-55). On October 1, 2015, Jose Becerra noted that Plaintiff made excellent gains and discontinued the physical therapy. *Id.*

29. On August 26, 2015, Plaintiff was seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (UIC 1223-26). Plaintiff reported that he was doing physical therapy. Plaintiff also claimed that the steroid injection "significantly" helped with his pain. He continued to experience Raynaud's disease symptoms, without ulcerations. He was continued on Procardia Lisinopril, Aspirin and MTX. Plaintiff also complained about left shoulder pain, which was diagnosed as likely caused by arthritis of the glenohumeral joint and rotator cuff tendonitis and was noted to be "resolved/improved today." (UIC 1226). Dr. Volkov

recommended that Plaintiff continue physical therapy. Plaintiff received another steroid injection in his knee. (UIC 1226). Dr. Volkov requested a follow-up appointment in three months. *Id.*

30. On December 8, 2015, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (MR 503). The follow up appointment was approved on December 9, 2015. (MR 502).

31. On December 9, 2015, Plaintiff was seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (UIC 1218 - 1221). Plaintiff explained that after the last injection, his knee pain improved. Plaintiff denied joint pain/swelling anywhere else. He claimed that his symptoms were under good control with current medications. Plaintiff also complained about left shoulder pain, which was diagnosed as likely caused by arthritis of the glenohumeral joint and rotator cuff tendonitis. However, the doctor noted that left shoulder pain was "resolved/improved." Dr. Volkov recommended that Plaintiff perform range of motion and muscle strengthening exercises and showed some of the exercises to Plaintiff. Plaintiff's various medications to treat his conditions were continued. *Id.* Dr. Volkov requested a follow-up in three months. (UIC 1221).

32. On December 9, 2015, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (MR 505). The follow up appointment was approved on December 15, 2015. (MR 504).

33. On April 26, 2016, Plaintiff was seen by a nurse and stated that he needs his permit, his lotion and his shampoo renewed. (MR 467). The nurse noted that Plaintiff's chart will be presented to a doctor to evaluate if renewals are appropriate, or if further evaluation is needed. *Id.*

34. On May 16, 2016, Plaintiff was seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (UIC 1213 - 1217). Plaintiff stated that he was doing "very well." *Id.* He denied significant joint pain. *Id.* However, he did complain of stiffness after activity in the shoulders. *Id.* Overall, Plaintiff explained that his symptoms were under good control with current medications. Plaintiff also explained that he was doing physical therapy and yoga exercises daily. *Id.* Pertaining to his shoulders, Plaintiff complained of left and right shoulder pain, which was assessed as likely caused by arthritis of the glenohumeral joint and rotator cuff tendonitis. (UIC 1217). The doctor noted that the pain "worsened since previous," and recommended physical therapy for shoulder range of motion. *Id.* Dr. Volkov requested another follow-up appointment in three months. *Id.*

35. On May 17, 2016, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (MR 89). The follow up appointment was approved and Plaintiff was seen at UIC on May 23, 2016. (MR 98).

36. On May 17, 2016, Plaintiff was seen by Dr. Obaisi for post medical writ visit and re-evaluation of permits. Dr. Obaisi noted that Plaintiff's left shoulder abduction was 120 degrees. Plaintiff also declined physical therapy and stated that he will do self-exercise and that he was instructed on the exercises by his Rheumatologist. (MR 470).

37. Also, on May 17, 2016, Dr. Obaisi re-issued the low bunk and low gallery permits, but not the waist-chain permit. Dr. Obaisi also changed the medical shower permit to daily. Plaintiff was also granted a gloves permit in cold weather. These permits were also issued for one year. (MR 892).

38. On July 19, 2016, Plaintiff was seen by a nurse complaining of shoulder and wrist pain. Plaintiff stated that he has had pain "since they shook us down." (MR 10). Plaintiff was

9

referred to M.D. Sick Call. *Id.* M.D. Sick Call is a medical appointment where an inmate is seen and treated by either a physician or a Physician's Assistant.

39. On July 21, 2016, Plaintiff was seen by a Physician's Assistant and told her that "due to a shakedown last week" he had pain in the right shoulder and numbness and tingling in his hand. The record does not indicate which hand. Plaintiff also complained of pain in both wrists. The P.A. noted that both of Plaintiff's wrists were tender to palpation, but had good range of motion. Abrasions were noted on both of Plaintiff's wrists and Plaintiff's right wrist was swollen. Plaintiff's right shoulder had a decreased range of motion and strength. The P.A. diagnosed acute wrist pain and right shoulder strain. The P.A. prescribed Motrin to be taken twice per day for 14 days. (MR 11).

40. On August 24, 2016, Plaintiff was seen in nurse sick call and complained that since the incident with the shakedown (Orange Crush) when they forced his hands behind his back, he still has numbness in both hands. Plaintiff admitted that "it was getting better all the time, but it's still occurring." (MR 14).

41. On September 19, 2016, Plaintiff was again seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (UIC 1209-1212). Plaintiff said that overall he was doing well. However, he complained of decreased range of motion in his shoulders, which was worse on the left. Plaintiff also admitted that he was still lifting weights. Specifically, the medical record states, "still lifting weights (stopped it 3m ago) but having had time to lift it. (UIC 1209). Plaintiff also complained about being handcuffed for four hours, and ever since he has intermittent numbness and tingling in the fingertips. *Id.* Regarding the finger numbness, Plaintiff was diagnosed with carpal tunnel syndrome and was recommended to use a wrist brace at night. (UIC 1211). If the carpal tunnel was not well controlled next time, the doctor was going

to consider prescribing gabapentin (medication used to treat nerve pain). *Id.* Regarding Plaintiff's shoulders, Dr. Volkov noted that Plaintiff's pain was likely due to a combination of arthritis in the glenohumeral joint and rotator cuff tendonitis. Plaintiff was encouraged to stop heavy weight lifting and have physical therapy. The physical therapy was recommended to increase the range of motion in Plaintiff's shoulders. (UIC 1212). Dr. Volkov requested a follow-up appointment in three months. *Id.* Notably, Dr. Volkov's diagnosis of shoulder pain being caused by arthritis in the glenohumeral joint and rotator cuff tendonitis was the same as her diagnosis formulated during appointments which occurred prior to Plaintiff being handcuffed for "four hours." In other words, even though Plaintiff subjectively complained of pain which, according to Plaintiff, was caused by being handcuffed, Dr. Volkov's diagnosis was consistent with her prior diagnosis of a chronic degenerative condition. Additionally, Dr. Volkov's medical record does not contain any notations that Plaintiff's condition could have been exacerbated by being handcuffed.

42. On September 20, 2016, Dr. Obaisi saw Plaintiff and noted that a "nightly wrist brace was advised" by Dr. Volkov, and issued a low bunk, low gallery, and bilateral wrist brace permits for one year. (MR 17, 895). On the same date, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (MR 104). The follow-up appointment was approved on September 25, 2017. (MR 105).

43. On October 26, 2016, Plaintiff was seen in physical therapy for an initial evaluation. After the physical examination, Physical Therapist Jose Beccera recommended 8 sessions of physical therapy at a rate of 1 or 2 per week. (MR 19-20).

44. Plaintiff completed physical therapy sessions on November 3, 2016; November 10, 2016; November 17, 2016; November 24, 2016; December 1, 2016; December 8, 2016;

11

December 15, 2016; December 23, 2016; and, January 4, 2017. He was discharged on January 4, 2017. (MR 20-23, 27).

45. On January 5, 2017, Plaintiff was seen by the P.A. LaTanya Williams for complaints of intermittent pain and intermittent tingling of the left shoulder at night. (MR 26). P.A. Williams ordered an x-ray of Plaintiff's shoulder. *Id.* The x-ray was taken on January 9, 2017, and disclosed moderate degenerative joint disease in the left shoulder. The right shoulder had negative findings except for a bullet. (MR 336). Plaintiff was again seen by the P.A. on January 30, 2017, and informed of the results of the x-ray. (MR 29).

46. On April 3, 2017, Plaintiff was again seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (UIC 1204-1207). Plaintiff complained of still having issues with both shoulders, more with the left shoulder. (UIC 1204). Plaintiff complained of decreased range of motion and pain in his shoulder. *Id.* Plaintiff further stated that he decreased repetition in terms of weightlifting to 225 lbs once a week. *Id.* Plaintiff was diagnosed with stable bilateral carpal tunnel syndrome and encouraged to use a brace. Plaintiff's left and right shoulder pain was again diagnosed as a combination of arthritis of the glenohumeral joint and rotator cuff tendonitis. The doctor also requested an MRI of the shoulder without contrast to evaluate for left shoulder tear. Finally, the doctor asked that Plaintiff refrain from weightlifting. (UIC 1207). Dr. Volkov requested a follow-up appointment in three months. *Id.*

47. On April 4, 2017, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (MR 96). The follow up appointment was approved on April 11, 2016. (MR 95).

48. Additionally, on April 11, 2017, Dr. Obaisi participated in a Collegial Review Conference with Dr. Ritz and the MRI of Plaintiff's left shoulder was approved. (MR 97).

49. On August 7, 2017, Plaintiff was seen by Dr. Volkov at UIC Hospital. Plaintiff again complained of pain and decreased range of motion with both shoulders. The left shoulder bothered him more than the right. Plaintiff claimed that he cannot lift weights anymore. Additionally, there was no room in his cell to do exercises and he wasn't doing them anymore. At this time, Plaintiff still did not receive his MRI. Plaintiff was again diagnosed with stable bilateral carpal tunnel syndrome and encouraged to use a brace at night. Plaintiff's left and right shoulder pain was again diagnosed as a combination of arthritis of the glenohumeral joint and rotator cuff tendonitis. The doctor also requested an MRI of the shoulder without contrast to evaluate for left shoulder tear. Finally, Dr. Volkov again asked that Plaintiff continue to refrain from weightlifting. (UIC 1199-1203).

50. On August 9, 2017, Plaintiff was seen by Dr. Obaisi for a post-medical writ appointment, and Dr. Obaisi noted that the MRI had not been done yet at UIC. (MR 46).

51. On August 31, 2017, Plaintiff was seen by Dr. Obaisi for permit renewal and the doctor issued low bunk, low gallery, and bilateral wrist brace permits for one year. (MR 49, 369).

52. On September 14, 2017 the UIC medical records contain an addendum stating that UIC received a phone call from Barbara Johnson requesting that an order be entered for MRI as recommended by Dr. Volkov. (UIC 1199).

53. On September 18, 2017, Dr. Obaisi requested another follow up appointment at UIC Hospital's Rheumatology Clinic. (MR 99). The follow up appointment was approved on September 25, 2017. (MR 105). Additionally, September 25, 2017, Collegial Review conference record noted that Plaintiff's MRI was approved on April 11, 2017, but had not yet been completed. *Id.*

13

54. UIC Hospital records contain a notation that Plaintiff's shoulder MRI was cancelled on October 6, 2017. (UIC 1332). On the same date, a Transfer Summary Form states that Plaintiff needs x-ray images of previous bullet wounds before an MRI can be completed. (MR 51). Cancelling Plaintiff's MRI was appropriate if Plaintiff still had bullet fragments in his body. The use of an MRI machine, which is essentially a very powerful magnet, is absolutely incompatible for anyone who has bullet fragments in their body.

55. On October 10, 2017, Dr. Obaisi issued Plaintiff a low bunk, low gallery, and waist-chain permits for one year. (MR 370). However, the waist-chain permits were only issued for when Plaintiff left the prison on writs. *Id.* Dr. Obaisi also issued Plaintiff permits for bilateral wrist braces, and an extra roll of toilet paper. *Id.*

56. On October 17, 2017, Plaintiff was seen at UIC Hospital Rheumatology Clinic for a follow-up. (UIC 1193-1198). Plaintiff again complained of pain and decreased range of motion with both shoulders. (UIC 1193). Left shoulder bothered him more than the right. Dr. Volkov again diagnosed that Plaintiff's shoulder pain was a "likely combination of arthritis in glenohumeral joint and rotator cuff tendonitis. (UIC 1197). Dr. Volkov ordered an x-ray report from Plaintiff's primary care doctor (Dr. Obaisi) and also ordered a left shoulder CT without contrast. (UIC 1197). No record could be located explaining the change from MRI to CT, but a reasonable explanation is that due to Plaintiff having bullets in his body, an MRI could not have been taken. Finally, Dr. Volkov requested a follow-up appointment in three months. *Id.*

57. On October 17, 2017, Dr. Obaisi requested another follow up appointment at UIC Hospital's Rheumatology Clinic. (MR 127). The follow up appointment was approved on October 25, 2017. (MR 126).

58. Additionally, on October 17, 2017, Dr. Obaisi requested a Collegial Review conference for a CT scan of Plaintiff's left shoulder. (MR 114). The Collegial Review conference was held on October 25, 2017, and the CT scan was approved. (MR 113).

59. On October 18, 2017, x-rays of Plaintiff's shoulder, groin, thigh and rib cage were taken and showed that Plaintiff had bullets in his right proximal arm, right upper chest wall, and in mid-thigh. (MR 337).

60. On March 6, 2018, Plaintiff was issued low bunk, low gallery, daily shower, and bilateral wrist brace permits. The permits were issued for six months. The corresponding progress note only states that there was a follow up for a permit renewal. (MR 372).

61. On April 23, 2018, Plaintiff had a CT scan of his left shoulder. (UIC 1387). The findings were "marked degenerative changes." *Id.* There was no large full-thickness retracted rotator cuff tear visualized. Partial tear or patella full-thickness tear was difficult to exclude by CT technique. *Id.*

62. On August 6, 2018, Plaintiff was seen at UIC Hospital Rheumatology Clinic for a follow-up by Dr. Volkov. (UIC 1187- 1192). Plaintiff stated that his overall symptoms remained at the same level of severity since his last visit. He still had intermittent swelling and joint pain. Plaintiff also explained that he completed physical therapy. Finally, Plaintiff wanted to know the results of the CT scan. *Id.* Dr. Volkov noted the following pertaining to Plaintiff's rotator cuff: "no full thickness or partial tear – no need for sx (surgery)." Plaintiff was advised to restart Hydroxychloroquine (HCQ) (medication used to treat rheumatoid arthritis, among other uses). Dr. Volkov requested a follow-up appointment in three months. (UIC 1192).

63. On August 14, 2018, Dr. Okezie participated a Collegial Review conference to refer Plaintiff to an Orthopedist for an evaluation of his left shoulder complaints. The request

was denied, in favor of an alternative treatment plan to treat Plaintiff on site and restart HCQ medication as was recommended by Dr. Volkov. (MR 121).

64. Dr. Okezie also participated in a Collegial Review conference to refer Plaintiff for a follow-up at the Rheumatology Clinic. On August 14, 2018, the referral was approved. (MR 123).

65. On October 5, 2018, I issued Plaintiff a waist-chain permit, but only for the times that he left prison on a writ. (MR 378). The permit was issued to keep Plaintiff comfortable because transfers outside the prison take a long time. The permit was not issued because I was concerned that if Plaintiff is cuffed normally he would experience any type of injury.

66. On November 26, 2018, Plaintiff was seen at UIC Hospital Rheumatology Clinic for a follow-up by Dr. Volkov. (UIC 1181 - 1186). He stated that his joint pain has improved since he restarted HCQ. Plaintiff's CT was reviewed and the doctor noted that Plaintiff's shoulder pain was noted as "likely multifactorial cause of pain." Dr. Volkov also noted that Plaintiff was already scheduled for a follow-up with orthopedics. (UIC 1185).

67. On December 4, 2018, I saw Plaintiff for a medical evaluation post medical writ to UIC Hospital. (MR 893). I reviewed Plaintiff's medical records from UIC, and based on Dr. Volkov's assumption that Plaintiff was already scheduled for an orthopedic evaluation, I treated that notation as a recommendation for an orthopedic consult. Consequently, I requested a Collegial Review Conference for an orthopedic evaluation "due to a tear in the left shoulder." *Id.* Importantly, the "tear in the shoulder notation," was not my diagnosis of Plaintiff's shoulder condition, but rather my understanding of Dr. Volkov's concerns and the reasons she recommended an orthopedic consult. Plaintiff's prior CT ruled out a full thickness tear, but could not rule out a partial thickness tear. Plaintiff presented with decreased range of motion in his

shoulders, and more specifically, there was tenderness anteriorly and decreased external rotation. Since Dr. Volkov recommended an orthopedic evaluation, I assumed that the recommendation was made due to a concern of some sort of a tendon tear in Plaintiff's shoulder.

68. Consequently, on December 11, 2018, I and Dr. Ritz participated in a Collegial Review Conference to have Plaintiff be evaluated by and Orthopedist. (MR 894). In the Collegial Review conference we discussed that according to the CT scan taken on April 23, 2018, Plaintiff had advanced degenerative changes in his shoulder, and the referral for an orthopedic evaluation was approved on December 11, 2018. *Id.*

69. On May 6, 2019, Plaintiff was seen at UIC Hospital Rheumatology Clinic for a follow-up by Dr. Volkov. (UIC 1175–1180). He complained that he ran out of MTX three weeks ago and developed a flare including pain, swelling and "tongue bumps." *Id.* Plaintiff also claimed that while he was on MTX he was feeling fine. He felt that his symptoms were controlled. *Id.* On physical examination, it was noted that Plaintiff had limited range of motion in his shoulders, (left shoulder worse than the right shoulder). *Id.* Another portion of the medical record stated that Plaintiff actually restarted MTX one week ago. Plaintiff's shoulder pain was noted as "likely multifactorial cause of pain." Plaintiff still had not seen an Orthopedist, but was hopeful to see one soon. *Id.*

70. On May 13, 2019, Plaintiff was seen at UIC Hospital by Orthopedist Dr. Benjamin Goldberg. (UIC 337-338). Plaintiff complained about pain which was exacerbated by any type of movement. *Id.* Plaintiff claimed that he tried physical therapy without any relief. *Id.* After a physical examination and reviewing the April 23. 2018 CT scan, Dr. Goldberg noted that the scan demonstrated severe degenerative changes with subchondral cysts and profound collar osteophyte formation. Dr. Goldberg further noted that Plaintiff's physical examination was

17

consistent with a "likely rotator cuff tear." Consequently, Dr. Goldberg proposed and Plaintiff agreed to proceed with "left reverse total shoulder arthroplasty," which is commonly referred to as a shoulder replacement surgery. Plaintiff's surgery was scheduled for July 9, 2019. (UIC/1 337-338). There are no indications in the medical record that the surgery was necessitated by anything other than Plaintiff's degenerative shoulder condition. *Id.* Furthermore, there were no notations in the medical record that Plaintiff's "likely rotator cuff tear" was caused by anything other than a chronic degenerative condition. *Id.*

71. On July 8, 2019, Dr. Golberg entered a medical record stating that Plaintiff was scheduled for shoulder surgery on July 9, 2019, but, unfortunately, the doctor had to add two emergency cases and Plaintiff's surgery would have to be moved to October 7, 2019. (UIC 488).

72. On December 2, 2019, Plaintiff was seen by Dr. Goldberg for a left reverse shoulder arthroplasty. (UIC 474-76). The pre-operative and post-operative diagnosis was left shoulder end-stage arthritis. *Id.* Plaintiff tolerated the surgery well and without complications. There are no notations in the operative report that indicates that Plaintiff had a torn shoulder tendon. *Id.* Moreover, there are no indications in the operative report that the surgery was necessitated by anything other than Plaintiff's degenerative shoulder condition. *Id.*

73. Consequently, although Dr. Goldberg suspected a rotator cuff tear prior to surgery, after an actual visual examination of Plaintiff's shoulder tissues, no tear was noted in the operative report.

## **OPINIONS**

74. My medical treatment of this patient complied with the applicable community standard of medical care.

75. Dr. Obaisi's medical treatment of this patient complied with the applicable community standard of medical care.

76. Throughout the treatment Plaintiff received from Dr. Obaisi, Dr. Obaisi consistently followed the recommendations of Dr. Volkov and referred Plaintiff for follow-up appointments and physical therapy. Following the recommendations of a Rheumatologist complied with the applicable community standard of medical care for the treatment of a patient with Plaintiff's degenerative condition.

77. Neither my medical treatment nor Dr. Obaisi's medical treatment caused any harm to this patient. All decisions to either grant or not grant medical permits to this patient complied with the applicable community standard of medical care.

78. There is no medical evidence that Plaintiff's degenerative shoulder condition required the issuance of a waist-chain permit.

79. There is no medical evidence that Plaintiff was injured as a result of being handcuffed behind his back during the IDOC's tactical team "shakedown" which occurred on July 12, 2016.

80. According to the medical records Plaintiff was always treated for his degenerative shoulder condition. Any changes in Plaintiff's medical treatment are due to the progression of his chronic condition and not due to any acute injury.

81. UIC Hospital schedules non-emergency patients based on availability. Wexford and Stateville personnel do not control patient scheduling.

82. Medical directors, physicians and Physician's Assistants at Stateville Correctional Center do not schedule patients for appointments. That function is performed by other Healthcare Unit staff.

83. All of my opinions are rendered to a reasonable degree of medical certainty.

84. The basis for my opinions is my education, training, and experience as a licensed medical doctor combined with my refreshed recollection of the patient based on reading his medical records.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on September 29, 2020

Dr. Marlene Henze

9550312 EKHATSKI;EKHATSKI