IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT SAFFOLD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 18 CV 3301 |
| | ) | |
| ILLINOIS DEPARTMENT OF CORRECTIONS, et al., | ) ) | Chief Judge Rueben Castillo |
| | ) | Magistrate Judge Maria Valdez |
| Defendants. | ) | |

**RULE 56.1 UNCONTESTED STATEMENT OF MATERIAL FACTS**

Defendants Daniel Artl, Randy Pfister, and Christopher Medin, (hereinafter "Defendants"), by their attorney, Kwame Raoul, Attorney General for the State of Illinois, and pursuant to Local Rule 56.1, file the following materials referred to in their Rule 56 Motion for Summary Judgment.[1]

**LOCAL RULE 56.1(a)(1) FILING**

A. Affidavit of ARB Chairperson Sherry Benton, attached as Exhibit A.

B. Transcript of the Deposition of Robert Saffold, taken June 17, 2019, attached as Exhibit B.

C. Transcript of the Deposition of Sunica Volkov, MD, taken October 22, 2019, attached as Exhibit C.

**LOCAL RULE 56.1(a)(3(A) FILING**

**Jurisdiction and Venue**

1. This is a civil action brought under 42 U.S.C. § 1983 and therefore this Court possesses jurisdiction over Plaintiff's claims. *See generally* Docket # 26.

---

[1] The facts set forth in Defendants' L.R.56.1 Statement of Uncontested Facts are undisputed for purposes of summary judgment only.

1

2. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred within this District. *Id.*

## Parties

3. Plaintiff, Robert Saffold ("Plaintiff") was an Illinois resident at the time of the events giving rise to this lawsuit. Docket at # 26. During all times relevant hereto, Plaintiff was incarcerated at Stateville Correctional Center ("Stateville"). *Id.*.

4. Plaintiff brings the present action against Illinois Department of Corrections employees: Daniel Artl, Randy Pfister, and Christopher Medin. *Id*. His Amended Complaint asserts the IDOC Defendants were deliberately indifferent to his serious medical needs by refusing to allow him to be front-cuffed or waist-chained on July 12, 2016, thereby causing injury to his left shoulder. *Id*. Plaintiff also alleges that Defendants refused to provide him medical treatment for his alleged shoulder injury. *Id*.

5. Venue is not contested by the parties. *Id*.

## Facts Underlying Plaintiff's Amended Complaint

6. On July 12, 2016, IDOC's Statewide Tactical Unit ('TACT Team') conducted a facility wide shakedown operation at Stateville Correctional Center.

7. Plaintiff states that "this entire lawsuit is about a torn shoulder…[which occurred on] July 12 of 2016." (Ex. B at 22:24-23:4).

8. On July 12, 2016 IDOC's Statewide Tactical Team ("TACT") came onto Plaintiff's gallery. (*Id.* at 57:5-20). At the time the TACT officers arrived at Plaintiff's cell, Plaintiff showed a December 9, 2015 [medical] special services report from UIC hospital (*Id.* at 57:21-22) to the TACT officers. (*Id.* at 61:7-8; 63:18-19; 65:1-18; 66:7-11). Plaintiff did not have, and did not present, any medical permits at the time. (61:9-10).

9. Plaintiff expected the tactical team members to read and understand the special services report as it pertained to his medical condition(s). (*Id.* at 67:9-10; 67:22-68:1; 68:2-4). However, Plaintiff does not know if the TACT team members had any medical knowledge. (*Id.* at 69:12-16).

10. Generally, Medical Special Services Reports are filed every time Plaintiff goes to UIC. (*Id.* at 60:11-14). The form is used to inform the medical director of Stateville of the status of Plaintiff's treatment. (*Id.* at 60:23-24). A medical special services report is <u>not</u> a medical permit. (*Id.* at 61:4-6). Instead, it explains what happened during the referred-out appointment. (*Id.* at 62-63).

11. The special services report Plaintiff presented the TACT team members on July 12, 2016 does not say 'no handcuffs.' (*Id.* at 70:1-2). The form does not mention handcuffs or waist restraints in any way. (*Id.* at 70:3-8).

12. Plaintiff did not provide the tactical officers who handcuffed him in his cell any medical permit prior to being handcuffed on July 12, 2016. (*Id.* at 153:4-8).

13. Plaintiff did not inform the officer who was cuffing him that he had any medical diagnosis of any kind relating to his shoulder. (*Id.* at 155:5-9).

14. Plaintiff testified at deposition that he is able to be handcuffed behind the back by pulling his right arm further across his back and keeping his left arm closer to his left side. However, he neglected to tell any of the TACT officers that information before they handcuffed Plaintiff on July 12, 2016. (*Id.* at 156:18-23).

15. After he was handcuffed, the TACT officers took Plaintiff to the dining room, where he sat down. (*Id.* at 157:14-23).

16. After a time, Plaintiff told CO Medin, Randy Pfister, and Dan Artl that he needed a med tech. (*Id.* at 158:20-160:24).

17. Defendants sent a nurse to see plaintiff and his handcuffs were removed. (*Id.* at 164:2-19).

18. Two days later, on July 14, 2016 Plaintiff elected to refuse medical services because he did not want to pay a $5 copay. (*Id.* at 166:24-169:11). As a result, the nurse did not give him a full rundown physical examination. (Id.).

19. Plaintiff again refused medical services again on July 18, 2016. (*Id.* at 169:12-170:6).

### IDOC Grievance Procedures

20. The Illinois Department of Corrections has a formal grievance procedure for inmates to file complaints. *See* General Assembly's Illinois Administrative Code Title 20: Corrections, Criminal Justice, And Law Enforcement; Chapter I: Department of Corrections; Subchapter e: Operations; Part 504 Discipline And Grievances; Subpart F Grievance Procedures for Offenders, 20 Ill. Adm. Code § 504.800 *et. seq*. (West 2018); *see also* Affidavit of Sherry Benton, attached hereto as Exhibit "A" at ¶ 3.

21. Generally there are three steps to the grievance process. 20 Ill. Adm. Code § 504.800 *et. seq*.; *see also* Ex. A *generally*.

22. First an inmate must attempt to resolve grievances informally through his counselor. *Id.*

3

23. If the grievance, complaint, or issue remains unresolved, within sixty days of an incident, an inmate may file a written grievance on a grievance form available in all units of his institution, and which is considered the second step of the formal grievance process. Ex. A.

24. Staff is available to aid in the preparation of such grievances, and all inmates are entitled to take advantage of the grievance procedure. *Id*.

25. Prison employees serve as Grievance Officers, unless a given employee is directly related to the subject matter of the grievance. *Id*. The facility Grievance Officer may personally interview the inmate and/or witnesses as deemed appropriate and obtain relevant documents to determine the merits of the inmate's grievance. *Id*.

26. Upon completion of such investigation, the Grievance Officer generates a report containing the findings of the investigation, the Grievance Officer's conclusions and, if appropriate, a recommendation for relief. 20 Ill. Adm. Code § 504.800 *et. seq*.; Ex. A.

27. The offender's grievance and the Grievance Officer's Report are then forwarded to the Chief Administrative Officer/ Warden ("CAO") or the CAO's/Warden's designee for review and signature. *Id*.

28. The Grievance Officer's Report with the CAO's or designee's final decision is then submitted back to the offender. *Id*.

29. As a final step, if the inmate disagrees with the CAO's or designee's decision, he may appeal in writing to the Director of the Department by submitting the Grievance Officer's report and CAO's decision. *Id*.

30. The Administrative Review Board ("ARB"), as the Director's designee, reviews the appeal and first determines whether the inmate's grievance can be handled without the necessity of a hearing. *Id*. If so, the inmate is so advised. *Id*.

31. Other matters are scheduled for an ARB hearing involving an interview of the grieving inmate, examining relevant documents and, at the ARB's discretion, calling witnesses. *Id*. The ARB submits a written report of its findings and recommendations to the Director or designee, who reviews the report and makes a final determination on the grievance. *Id*. A copy of the ARB's report and the Director's final decision are sent to the inmate who filed the grievance. *Id*.

32. The originals of these documents are maintained in the ARB files pursuant to Department Rule 504 F: Grievance Procedures for Committed Persons, which provides for no further means for review beyond this step. 20 Ill. Adm. Code § 504.800 *et. seq*.; Ex. A.

33. In an emergency situation, an inmate may request a grievance be reviewed on an expedited basis by submitting the grievance directly to the facility CAO or his/her designee rather than a counselor or grievance officer. Ex. A.

34. If the CAO or his/her designee determines that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the inmate, the grievance may be handled on an emergency basis. *Id*.

35. If the CAO or his/her designee determines that the grievance does not warrant emergency review or processing, the inmate must resubmit the grievance in accordance with the regular grievance process as described above. *Id*.

36. An inmate may appeal the CAO's decision in such a situation to the ARB. The appeal is then handled in accordance with the procedures described above. Ex. A.

37. Certain issues may be addressed directly to the ARB, rather than first through a counselor or grievance officer. Ex. A. These issues are limited to:

    a. Decisions involving the involuntary administration of psychotropic medication;

    b. Decisions regarding protective custody placement, including continued placement in or release from protective custody;

    c. Decisions regarding disciplinary proceedings which were made at a facility other than the facility where the inmate is currently assigned; and

    d. Other issues except personal property or medical issues which pertain to a facility other than the facility where the inmate is currently assigned.

    *See* 20 Ill. Adm. Code § 504.800 *et. seq.*; Ex. A.

38. Grievances that can be addressed directly to the ARB are then handled according to the regular grievance process. *Id*.

39. Upon arrival at a State correctional facility, inmates are made aware of the rules and regulations of the institution and IDOC though an orientation manual and oral presentation. Ex. A.

40. This orientation includes the process for filing grievances. *Id*.

41. Counselors are also available if the inmates have any questions about the correctional center's policies and procedures. *Id.*

**Plaintiff's Failure to Exhaust Administrative Remedies**

42. Plaintiff is familiar with the inmate handbook. (Ex. B at 12:18-20). He has read it for the most part. (*Id.* at 13:8-9).

43. Plaintiff is familiar with the grievance process within IDOC. (*Id.* at 14:21-22).

44. Plaintiff agrees that an inmate must write their grievance within 60 days of the occurrence giving rise to the grievance. (*Id.* at 18:15-17).

45. Plaintiff agrees that an inmate must appeal a grievance resolution within 30 days of the decision. (*Id.* at 18:6-14).

46. Plaintiff acknowledges that a grievance must be written on an IDOC grievance form and placed in the counselor's inbox. (*Id.* at 15:7-16-12). If the grievance is regular, it goes to the counselor who then responds. (*Id.* at 16:13-17). If the grievance is marked as an emergency, it goes to the warden. (*Id.* at 16:18-19).

47. Contrary to the Illinois Administrative Code, Plaintiff does not believe he has to resubmit a grievance that has been deemed 'not an emergency' by the warden. (Ex. B at 16:23-17:2).

48. Plaintiff admits that the grievance form instructs inmates to resubmit their grievance through the regular channels if it is deemed not an emergency. (*Id.* at 17:19-22). However, any time Plaintiff sends a grievance in and the warden signs it—regardless of whether it was returned (deemed non-emergent)—he nevertheless sends it downstate to the ARB board (instead of following the instructions on the grievance form). (*Id.* at 17:23-18:5).

49. Plaintiff filed a regular grievance on July 12, 2016 which described a May 15, 2016 diagnosis of his suffering a "severe case of rheumatoid arthritis," "undifferentiated connective tissue disease w[ith] raynaud's ulcer, with severe rotator cuff tendonitis and impairment syndrome…." (Ex. A at ¶¶11-12). In the grievance, Plaintiff mentions that he was not given a medical permit, and instead suffered severe pain for 3+ hours while handcuffed behind the back by 'Orange Crush' team. He further complains that C/O Medin refused to adjust his handcuffs and refused to call for medical treatment. (*Id.*; Ex. B at 139:2-14).

50. The 7/12/16 grievance did not name Randy Pfister or Daniel Artl. (Id. at 139:15-17). So too, the 7/12/16 grievance did not specify any date upon which Plaintiff was handcuffed for 3+hours, or the date when Defendant Medin allegedly refused to adjust his handcuffs and call for medical attention. (Ex. A at ¶11).

51. Plaintiff's grievance counselor responded to his 7/12/16 grievance on August 4, 2016. (*Id.* at ¶12). A second response was sent to Plaintiff on October 21, 2016.

6

(*Id*.). Plaintiff appealed the second (10/21/16) response to the ARB on October 23, 2016. (*Id*.).

52. On November 10, 2016, the ARB denied Plaintiff's 10/23/16 grievance appeal. (*Id*.) In its denial, the ARB noted that Plaintiff's 7/12/16 grievance failed to meet the requirements of the Administrative Code (D.R. 504.810) because the grievance: (1) failed to provide a date for the incident, and; (2) only provided a date of 5/15/16—a date well outside of the 60 day limitations period for grievance appeals. (*Id*.).

53. Additionally, Plaintiff filed an emergency grievance on July 13, 2016 (prior to receiving a reply to his July 12, 2016 regular grievance). (Ex. A at ¶13); Ex. B at 135:22-136:2).

54. In the 7/13/16 grievance, Plaintiff again complains of the way he was handcuffed/treated during a TACT shakedown at Stateville. (*Id.*). The grievance mentions CO Medin (Ex. A at ¶13; Ex. B at 136:3-9), but fails to name any other IDOC officer or employee. (Ex. B at 136:13-16; 139:18-21).

55. Plaintiff learned of Defendant Artl's identity and involvement in the 7/12/16 shakedown about a month after he filed his 7/12/16 and 7/13/16 grievances, yet he never filed any grievance naming Artl with IDOC. (Ex. B at 140:21-141:3).

56. Plaintiff observed that Defendant Pfister was present during the 7/12/16 TACT shakedown at Stateville. (*See* Dkt. 26). However, neither Plaintiff's 7/12/16 regular grievance, nor his 7/13/16 emergency grievance, make any mention of Defendant Pfister. (Ex. A at Exh. A thereto).

57. On July 26, 2016, Defendant Pfister denied Plaintiff's 7/13/16 'emergency' grievance as "emergency not substantiated." (Ex. A at ¶14). Instead of resubmitting the returned grievance through the normal channels, Plaintiff then sent the emergency grievance directly to the ARB for appeal. (Ex. A at ¶14

58. On August 30, 2016, the ARB denied Plaintiff's 7/13/16 grievance appeal as lacking sufficient documentation. (*Id*.). The ARB specifically instructed Plaintiff to provide a copy of his original offender's grievance along with the grievance officer and chief administrative officers' response—essentially, admonishing Plaintiff to resubmit the emergency grievance and await a response from the facility. (*Id*.).

59. Plaintiff never provided the ARB with a full record sufficient to determine any appeal of his grievances related to the 7/12/2016 TACT shakedown. (*Id*. at ¶15). As of August 10, 2020, no further correspondence, grievances and/or appeals relating to the July 12, 2016 TACT shakedown at Stateville C.C. have been received by the ARB from Plaintiff. (*Id*.).

**Plaintiff's Medical Diagnoses and Treatment**

60. Plaintiff [incorrectly] believes that his UIC medical records show a diagnosis of a [left] shoulder tear. (Ex. B at 23:23-24:7; *see also* below).

61. Dr. Sunica Volkov, an MD in internal medicine with fellowship in rheumatology from University of Chicago (Ex. C at 7:14-24; 8:1-4), has been working at UIC since 2006 and treating Plaintiff since 2009. (Ex. C at 9:3-15).

62. Although a review of medical records was beneficial during her deposition, Dr.Volkov has an independent recollection of Plaintiff. (Ex. C at 9:23 – 10:24). The subjective portion of Dr. Volkov's progress notes were taken contemporaneously with Plaintiff's relating his own physical condition. (Ex. C at 10:4-8).

63. Based on his medical records at UIC, Plaintiff had been complaining of decreased range of motion in his shoulders since 2012. (Ex. C at 15:8-24). Initially, Dr. Volkov diagnosed Plaintiff with undifferentiated connective tissue disease. (Ex. C at 10:23 – 11:10). Her initial diagnosis for her treatment of Plaintiff's shoulders was tendonitis. (Ex. C at 12:2-6).

64. As of March 3, 2015, Dr. Volkov diagnosed Plaintiff with synovitis and swelling in the joints and hands, as well as decreased range of motion in his shoulders. (Ex. C at 13:19 – 14:23).

65. On May 19, 2015, Plaintiff complained of left shoulder pain. Dr. Volkov diagnosed Plaintiff as suffering from arthritis of the glenohumeral (rotator cuff) joint. (Ex. C at 16:4-11). Dr. Volkov believed at that time that Plaintiff was also suffering from rotator cuff tendonitis. (Ex. C at 16:14-17).

66. To remedy inflammation of the tendon, Dr. Volkov suggested anti-inflammatory medication and physical therapy, as well as corticosteroid injections. (Ex. C at 18:15-14). Plaintiff refused Dr. Volkov's suggestion. (Ex. B at 46:21-47:8). Instead, Plaintiff opted to rely on "a lot of shoulder stretching" at that time. (Ex. B at 49:7-16).

67. As of August 26, 2015, Plaintiff was still complaining of left shoulder pain while participating in physical therapy. (Ex. C at 23:13-19). Dr. Volkov's diagnosis continued to be rotator cuff and glenohumeral (rotator cuff) joint arthritis. (Ex. C at 23:20-24). Overall, Dr. Volkov noted that Plaintiff's condition appeared to have improved and recommended that he continue physical therapy. (Ex. C at 24:14-16).

68. During a December 9, 2015 visit with Dr. Volkow, Plaintiff exhibited continued decreased range of motion in the left shoulder. (Ex. C at 26:1-3).

69. On May 16, 2016, Plaintiff again saw Dr. Volkov for arthritis. (Ex. B at 51:9-16). Plaintiff complained of occasional stiffness after activity in his shoulders. (Ex. B at 52:8-16).

70. Plaintiff had no waist chain permit as of 5/16/16. (Ex. B at 51:20-22). Nothing in the May of 2016 medical records indicates that [Dr. Volkov] ever ordered any prohibition on behind the back cuffing. (Ex. B at 25:20-26:2). Dr. Volkov does not remember ever recommending that Plaintiff not be handcuffed behind the back. (Ex. C at 20:5-8).

71. If prohibiting IDOC from handcuffing Plaintiff behind the back as a medical intervention was ever discussed, it would be noted in his medical records. (Ex. C at 20:22 – 21:24). Nevertheless, although [Dr. Volkov] knew Plaintiff was a prisoner in May of 2016, nothing in the medical records mentions anything in relation handcuffs, waist chains, or any restraint system whatsoever. (Ex. B at 26:3-26:16).

72. Prior to May of 2016 (in around 2009, before Plaintiff's shoulder(s) became ill), Plaintiff was weightlifting a 340lb bench press. (Ex. B at 53:4-14; 54:2-6). Plaintiff related that, at some point, someone dropped a weight during his lift, thereby injuring his right rotator cuff. (Ex. B at 54:13-18).

73. As of May 16, 2016, although his shoulder was hurting, Plaintiff was still weightlifting, bench-pressing about 225lb. (Ex. B at 54:2-11). Plaintiff admits that he continued to lift weights (via the bench press) after May 16, 2016. (Ex. B at 55:20-56:6).

74. Throughout her treatment of Plaintiff, Dr. Volkov noted that Plaintiff's weight lifting was a risk factor for a tear in his shoulder tendon. (Ex. C at 37:7-15). Dr. Volkov told Plaintiff to stop weightlifting several times. (Ex. C. at 10). She instructed Plaintiff to stop lifting weights because it likely made his tendon inflammation worse, and increased his risk of a tendon tear. (Ex. C at 32:6-12).

75. Beginning in May of 2016, Plaintiff was prescribed several physical therapy exercises. (Ex. B at 33:21 – 34; 34:11-13, 23-24; 35:3-12). Plaintiff recalls successfully performing several physical therapy exercises after visiting UIC, including exercises he learned in yoga retreat at IDOC and not from his doctor. (Ex. B at 38 – 42; 44-46).

76. Plaintiff's physical therapy included exercises involving both of his arms/shoulders. (*Id.*). Particularly, Plaintiff was able to perform a specific physical therapy exercise (prescribed by his doctor at UIC) which involved placing both hands behind his back, with one hand grabbing the other hand around the area of the buttocks. (Ex. B at 42:17 – 43:24). In line with this fact, Dr. Volkov is not aware of any physical therapy prohibitions involving being handcuffed behind the back. (Ex. C at 19:4-20).

77. Plaintiff visited Dr. Volkov on September 19, 2016. (Ex. B at 71:16-20). As of 9/19/16, Plaintiff told Dr. Volkov that he had been weight lifting around 3 months prior to his appointment (during July, 2016); that he had stopped for a period, and then; that he had recently resumed weightlifting. (Ex. C at 28:6 – 29:2). Plaintiff also told Dr. Volkov that he had been handcuffed for over four hours and, since then, he had intermittent numbness in his fingertips. (Ex. B at 73:2-14; Ex. C at 29:3-9).

78. Regarding Plaintiff's shoulder, Dr. Volkov's 9/19/16 diagnosis was a continuation of Plaintiff's previously diagnosed arthritic conditions, involving his shoulder joint and tendon as an ongoing issue. (Ex. C at 29:11-15). She advised Plaintiff to stop heavy weight lifting and resume physical therapy. (*Id*.).

79. Plaintiff's shoulder issues were present in his body well before July of 2016. (Ex. C at 31:6-8). The issues and complaints he presented with on September 19, 2016 were a continuation of the same chronic condition of his shoulder that he had for over two years prior. (Ex. C at 30:22-31:3).

80. Regarding Plaintiff's finger/hand issues, he believes that the tightness of the handcuffs on July 12, 2016, coupled with his hands being forced behind his back 'all the time,' caused symptoms of tingling and numbness in his hands. (Ex. B at 73:22-24; 74:1-15). Dr. Volkov has never made any such finding with regards to Plaintiff's complaints of hand numbness/tingling, however. (Ex. B at 75:17-19). Instead, Dr. Volkov diagnosed Plaintiff's finger issues as being caused by carpal tunnel. (Ex. C at 31:9-11).

81. Additionally, on September 19, 2016 Dr. Volkov noted that Plaintiff suffers from Raynaud's syndrome. (Ex. C at 46:23 – 47:4). Raynaud's syndrome presents as the color of the fingertips changing, becoming blue or white, caused by spasms and the thinning of blood vessels in the fingers as a reaction to cold temperatures or stress. (Ex. C at 47:2-9). A person with Raynaud's syndrome will experience numbness, tingling and pain in the fingertips. (Ex. C at 47:16-18). Therefore, Raynaud's syndrome also explains Plaintiff's fingertip symptoms.

82. Contrary to Plaintiff's beliefs, the 9/1[9]/2016 UIC medical record notes that Plaintiff was doing overall well after his encounter with the tactical unit. (Ex. B at 71:21-72:1). Dr. Volkov's diagnosis of Plaintiff's shoulder did not change as a result of Plaintiff's complaints to her regarding being handcuffed for a prolonged period of time. (Ex. C at 30:2-13). Plaintiff did not present with any 'injury' during his September 19, 2016 visit with Dr. Volkov. (Ex. C at 30:17-21).

83. Plaintiff saw Dr. Volkov again on April 3, 2017. (Ex. B at 77:14-16). He related that he was still having problems with his left shoulder, including decreased range of motion and pain but, nevertheless; he was still able to lift 225lb on the bench press. (Ex. B at 78:3-22). Again, Dr. Volkov's assessment was that Plaintiff's left

and right shoulder pain was likely caused by a combination of arthritis and tendonitis. (Ex. B at 80:12-20).

84. On April 3, 2017, Plaintiff related to Dr. Volkov that he was continuing to lift weights (225 pound bench press, once per week). (Ex. C at 33:1-24). Again, Dr. Volkov encouraged Plaintiff to refrain from heavy weight lifting. (Ex. C at 34:9-10). Yet, Plaintiff was not following Dr. Volkov's recommendations to the extent she wanted him to. (Ex. C at 34:11-15; 35:3-7).

85. As of 4/3/17, Dr. Volkov's diagnosis of Plaintiff's shoulder issue continued to be a problem with arthritis in his shoulder joint and tendon. (Ex. C at 35:8-12). On that date, however, Dr. Volkov ordered an MRI of Plaintiff's shoulder because she suspected there may have been a tear. (Ex. C at 36:18-24; 37:1).

86. Plaintiff saw Dr. Volkov again on August 7, 2017. (Ex. B at 86:14-18). Plaintiff complained of decreased range of motion and pain in his shoulders, left more than right. (Ex. B at 86:24-87:6). He also stated he was unable to lift weights anymore, and that there was no room in the cell for him to perform his physical therapy exercises. (Ex. B at 86:12-18).

87. As of September 14, 2017, Dr. Volkov's office received a telephone call from Plaintiff's primary doctor requesting that an MRI be completed. (Ex. C at 39:11-18).

88. On October 6, 2017, plaintiff was scheduled for an MRI, which was cancelled. (Ex. C at 40:1-7). Instead, Dr. Volkov ordered a CT scan. (Ex. C at 40:11-22).

89. Plaintiff underwent a CT scan on April 23, 2018. (Ex. C at 42:6-9). The scan showed <u>no</u> definitive full thickness rotator cuff tear. (Ex. C at 42:13-16). Based on the CT scan result, Dr. Volkov saw no reason to recommend surgery. (Ex. C at 42:23-44:1).

90. Dr. Volkov interpreted Plaintiff's April 23, 2018 CT scan result as showing a lot of changes in the shoulder joint, all of which were related to rheumatoid arthritis, osteoarthritis and chronic inflammation (tendonitis). (Ex. C at 43:6-12). The development of these issues is a chronic event—meaning longstanding and developing over <u>years</u>. (Ex. C at 44:9-24).

91. Plaintiff saw Dr. Volkov again on August 6, 2018. (Ex. B at 90:21-91:4). On that date, Dr. Volkov again noted that there was **no full thickness or partial rotator cuff tear**. (Ex. B at 91:5-16).

92. As of November 26, 2018, Dr. Volkov interpreted Plaintiff's cause of shoulder pain as being multifactorial, meaning that it was caused by Plaintiff's rheumatoid arthritis, osteoarthritis, and inflammation of the tendon. (Ex. C at 45:13-18). Each

      of those conditions are chronic conditions. (Ex. C at 45:19-21). As these conditions progress, a shoulder tear can happen. (Ex. C at 45:22-24).

93. The only current evidence that connects Plaintiff's 7/12/2016 handcuffing to his pain (e.g., saying that they are causally related) is Plaintiff's lay opinion. (Ex. B at 100:18-22). No doctor has mentioned in any medical record that Plaintiff's shoulder pain was caused by him being handcuffed. (Ex. B at 102:24-103:4).

                                          Respectfully Submitted,

KWAME RAOUL                                                            */s/Nicholas V. Alfonso*
Attorney General of Illinois                               NICHOLAS V. ALFONSO
                                                                            Assistant Attorney General
                                                                            General Law Bureau
                                                                            Office of the Illinois Attorney General
                                                                            100 West Randolph Street, 13th Floor
                                                                            Chicago, Illinois 60601
                                                                            (312) 814-3711
                                                                            nalfonso@atg.state.il.us