# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

ROBERT SAFFOLD,

                     Plaintiff,

v.

ILLINOIS DEPARTMENT OF
CORRECTIONS, WEXFORD HEALTH
SOURCES, INC., DANIEL ARTL, RANDY
PFISTER, CHRISTOPHER MEDIN, JOHN
DOE #1, JOHN DOE #2, GHALIAH OBAISI,
Independent Executor of the Estate of SALEH
OBAISI,

                     Defendants.

Case Number  18 cv 3301

Honorable Judge Virginia M. Kendall

## PLAINTIFF'S RESPONSES TO DEFENDANT OBASI'S RULE 56.1 STATEMENT OF FACTS

1.      Plaintiff Robert Saffold brings a civil action authorized by 42 U.S.C. § 1983 and this Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331. (Doc. 32, ¶ 2). Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims occurred within this judicial district.  (Doc. 26, ¶ 3).

**RESPONSE: Undisputed.**

2.      Plaintiff initiated suit against Defendants Wexford Health Sources, Inc., ("Wexford"), Dr. Saleh Obaisi and other IDOC defendants claiming inappropriate medical treatment relating to a medical permit and being inappropriately handcuffed during a prison search performed by the IDOC's tactical team. (Doc. 1). Following the appointment of counsel, Plaintiff filed a First Amended Complaint on December 21, 2018. (Doc. 26). Plaintiff named Ghalia Obaisi as Independent Executor of the Estate of Dr. Saleh Obaisi (the "Obaisi Estate") as defendant. (Doc. 26, ¶13). On April 12, 2019, the parties filed a Joint Stipulation to Dismiss Wexford from this case. (Doc. 51). The Court entered an order dismissing Wexford from this

case on April 22, 2019 (Doc. 52). Plaintiff's Amended Complaint consists of three counts: Count I – denial of medical care against all defendants; Count II – Americans with Disabilities Act claim against the IDOC only; and, Count III – the Rehabilitation Act Claim against the IDOC only. (Doc. 26). Pertaining to the Obaisi Estate, Plaintiff alleges that Dr. Obaisi was deliberately indifferent to Plaintiff because he failed to prescribe a waist chain permit to Plaintiff. Defendant answered and substantially denied all of Plaintiff's relevant allegations. (Doc. 32).

**RESPONSE**: **Undisputed.**

## THE PARTIES

3.       Plaintiff Robert Saffold at all times relevant was an inmate in the custody of IDOC at Stateville. (Doc. 26, ¶ 4). Plaintiff is serving a life sentence. (Ex. A, Saffold Dep., 11:4-16). Plaintiff has no medical training. *Id.*

**RESPONSE**: **Undisputed that at all relevant times Plaintiff was incarcerated in the custody of IDOC at Stateville, that he is serving a life sentence, and that he has no formal medical training. Plaintiff has knowledge of the medical field through personal experience and close personal relationships with nurses. (Def. Ex. A, Saffold Dep., 11-12).**

4.       Defendant the Obaisi Estate is the estate of Dr. Obaisi who died. (Doc. 26, ¶ 13). At all times relevant, Dr. Obaisi was employed by Wexford Health Sources, Inc., as a Medical Director. *Id.*

**RESPONSE**: **Undisputed.**

## RELEVANT ALLEGATIONS

5.       Plaintiff alleges that from February 19, 2014 through August 19, 2014 and from July 31, 2014 through July 31, 2015, he received permits which, among other things, allowed for waist chain restraints. (Doc. 26, ¶ 51). Plaintiff furthers alleges that prior to July 12, 2016, he requested that Dr. Obaisi continue the waist chain provisions in his permits. (Doc. 26, ¶ 50).

However, the permits renewed on August 26, 2015 did not have a waist chain provision. (Doc. 26, ¶ 53).

**RESPONSE: Undisputed.**

6.      Plaintiff also alleges that on July 12, 2016, the IDOC state-wide tactical team conducted a "shakedown" of the prison. More specifically, the house, gallery and cell where Plaintiff was housed, and placed Plaintiff in handcuffs. (Doc. 26, ¶¶ 14, 15, 19). Plaintiff was handcuffed behind his back. (Doc. 26, ¶¶ 20, 23). Plaintiff allegedly experienced pain in his shoulder and restricted circulation. (Doc. 26, ¶ 24).

**RESPONSE: Undisputed.**

7.      Plaintiff did not have a waist chain permit on July 12, 2016. (Doc. 26, ¶ 54). Plaintiff blames Dr. Obaisi because Dr. Obaisi allegedly had knowledge of Plaintiff's condition and did not prescribe a waist chain permit. (Ex. A, Saffold Dep., 116:7-120:2). Plaintiff feels that the "incident" could have been prevented if he had a waist chain permit. *Id.*

**RESPONSE: Undisputed that Plaintiff did not have a waist chain permit on July 12, 2016, (Doc. 26, ¶ 54), and that Plaintiff is suing Dr. Obaisi for deliberate indifference of Plaintiff's medical needs, resulting in Plaintiff's injuries occurring as a result of the incident on July 12, 2016. *Id.* at ¶¶ 58-66.**

### Rule 26(a)(2)(C) EXPERTS

8.      Dr. Suncica Volkov was disclosed as a Rule 26(a)(2)(C) Expert by Defendant on October 8, 2019. *See* Def's 26(a)(2)(C) disclosures attached as Exhibit F. Dr. Volkov is Plaintiff's treating Rheumotologist and was deposed in this case. Dr. Volkov is a Rheumatologist employed by UIC Hospital in Chicago. She graduated medical school in Serbia and has completed a Fellowship in Rheumatology at University of Chicago Hospital (Ex. E, Volkov Dep., 7:7-8:4).

**RESPONSE: Undisputed.**

9. Dr. Marlene Henze was disclosed as a Rule 26(a)(2)(C) Expert by Defendant on January 23, 2020. *See* Def's First Amended 26(a)(2)(C) disclosures attached as Exhibit G. Dr. Henze graduated the Southern Illinois University School of Medicine in 1993, and completed a residency at Mc Neal Hospital in Berwyn, Illinois in 1996. (Ex. B, Henze Decl., ¶ 1). Dr. Henze has worked in physician employee and a solo practitioner in a family medicine practice and was later a hospitalist. *Id.* Dr. Henze has worked in correctional medicine since 2017. (*Id.* at ¶ 2).

**RESPONSE**: **Undisputed.**

## MEDICAL BACKGROUND ON PLAINTIFF'S MEDICAL CONDITION

10. Plaintiff has degenerative medical conditions which have been present since at least 2010. Plaintiff has Undifferentiated Connective Tissue Disease (a type of autoimmune disease), Arthritis, Raynaud's Disease (a condition that restricts blood vessels and blood flow usually in the fingers and toes), and Synovitis (inflammation of the tissues that line a joint). Pertaining more specifically to his shoulders, Plaintiff has been diagnosed with arthritis of the glenohumeral joint and rotator cuff tendonitis. Arthritis of the glenohumeral joint is typically a chronic and degenerative condition. It can be managed, but not cured. With passage of time, however, the progression of arthritis in the shoulder could lead to the need for shoulder replacement surgery. *See* Exhibit B, Declaration of Dr. Henze. (Ex. B, Henze Decl., ¶ 10).

**RESPONSE:** **Undisputed that Plaintiff has been diagnosed with medical conditions that can be degenerative, that some such diagnoses have been present since at least 2010, and that such diagnoses include the ones listed in ¶ 10. Undisputed that Plaintiff has been diagnosed with arthritis of the glenohumeral joint and rotator cuff tendinitis. Disputed that Plaintiff's arthritis and tendinitis are characterized only as degenerative and chronic; Plaintiff's shoulder was injured and his conditions exacerbated by the actions of Defendants before and on July 12, 2016. (Dkt. 94, Ex. C, Volkov Dep., 43:13-23).**

11.     Since as early as 2010, Plaintiff has been regularly going to the Rheumatology Clinic at UIC Hospital ("UIC") and treating with Dr. Suncica Volkov. Dr. Volkov is a Rheumatologist. (Ex. B, Henze Decl., ¶ 11).

**RESPONSE: Undisputed.**

12.     To further alleviate Plaintiff's discomfort due to his medical conditions, Plaintiff, at different times, has received various medical permits from different Medical Directors at Stateville. Generally speaking, a medical permit grants an inmate certain privileges otherwise not permitted to other inmates. By way of example, some medical permits: (1) allow inmates to reside on a low gallery of a cell house (thereby alleviating the need to climb stairs); (2) allow inmates to sleep on a lower bunk in a cell (thereby eliminating the need to climb on a top bunk); or, (3) allow for a modification from the normal shackling procedures (sometimes inside the prison and sometimes only on extended travel outside the prison). Other permits allow inmates with ambulation deficits to walk in a slow walk line, utilize crutches or eat meals in their cell. Other permits allow inmates additional showers, ice in their cells, additional toilet paper, or special shoes. (Ex. B, Henze Decl., ¶ 12).

**RESPONSE: Undisputed.**

13.     A waist chain permit allows for a non-standard restraint to be applied to an inmate. Regular restraints in a prison closely resemble handcuffs. When these restraints are utilized appropriately, an inmate is restrained with both hands behind his back. This hand positioning is uncomfortable (albeit not medically dangerous or painful), and most inmates do not like being restrained in that fashion. In a very specific set of medical circumstances, an inmate may require a waist chain permit. A waist chain restraint permits an inmate to be restrained without placing their hands behind their back. A leather restraint is another type of

restraint used to control inmates without placing their hands behind their backs. (Ex. B, Henze Decl., ¶ 13).

**RESPONSE: Undisputed.**

## PLAINTIFF'S RELEVANT MEDICAL HISTORY

14.     On July 20, 2012, Dr. Obaisi issued Plaintiff low bunk and low gallery permits for one year. Additionally, Plaintiff was issued a "glove" permit. (Ex. B, Henze Decl., ¶ 14; Ex. C, MR 851). The glove permit was due to Plaintiff's Raynaud's disease which can cause extremities (like fingers) to get very cold. On August 17, 2012, the gloves permit was upgraded to two (2) gloves. (Ex. B, Henze Decl., ¶ 14; Ex. C, MR 855). On July 16, 2013, Plaintiff's gloves permits and low bunk/low gallery permits were renewed for another year. (Ex. B, Henze Decl., ¶ 14; Ex. C, MR 859).

**RESPONSE: Undisputed.**

15.     Dr. Obaisi on July 15, 2013, held a Collegial Review conference for Plaintiff to be seen as a follow-up at UIC Rheumatology Clinic. The request was approved. (Ex. B, Henze Decl., ¶ 15; Ex. C, MR 483).

**RESPONSE: Undisputed.**

16.     On September 26, 2013, Dr. Obaisi issued Plaintiff low bunk, low gallery, and waist-chain permits for one year. (Ex. B, Henze Decl., ¶ 16; Ex. C, MR 862). Dr. Obaisi also issued a gloves permit for cold weather. *Id.* The corresponding progress note for the same date states that Plaintiff has Undifferentiated Connective Tissue Disease, and notes that Plaintiff is taking various medications (Prednisone, CellCept, Nifedipine). (Ex. B, Henze Decl., ¶ 16; Ex. C, MR 403).

**RESPONSE: Undisputed.**

17.     On February 19, 2014, Dr. Ann Davis re-issued the same permits that were issued on September 26, 2013 until August 19, 2014. Dr. Davis also issued a permit for an additional roll of toilette paper per week. (Ex. B, Henze Decl., ¶ 17; Ex. C, MR 867).

**RESPONSE**: **Undisputed.**

18.     On March 14, 2014, Dr. Olga Vila saw Plaintiff at UIC Hospital's Rheumatology Clinic as a follow-up. Plaintiff reported that his joint pains have largely improved, but complained about pain in the second finger of his right hand. (Ex. B, Henze Decl., ¶ 18; Ex. D, UIC 1239). The doctor noted that Plaintiff was doing well on Mycophenolate Mofetil ("MMF"), a drug used to treat connective tissue disease, and the drug was continued. (Ex. B, Henze Decl., ¶ 18; Ex. D, UIC 1237). Plaintiff received a Cortisone injection into the second finger of his right hand (Cortisone is used to relieve pain and inflammation). (Ex. B, Henze Decl., ¶ 18; Ex. D, UIC 1236). After a physical examination, the doctor noted that Plaintiff had a full range of motion without effusion (an abnormal collection of fluid in the hollow spaces of the body) in both of his shoulders, knees and elbows. (Ex. B, Henze Decl., ¶ 18; Ex. D, UIC 1239).

**RESPONSE**: **Undisputed.**

19.     On May 13, 2014, Dr. Obaisi issued Plaintiff a permit for medical showers for one year. (Ex. B, Henze Decl., ¶ 19; Ex. C, MR 871). On June 12, 2014, the shower permit was amended to include three showers per week. (Ex. B, Henze Decl., ¶ 19; Ex. C, MR 873).

**RESPONSE**: **Undisputed.**

20.     On July 31, 2014, Dr. Obaisi re-issued Plaintiff low bunk, low gallery, and waist-chain permits for one year, and increased the medical showers to four per week. Plaintiff also received an additional roll of toilet paper per week and gloves in cold weather. (Ex. B, Henze Decl., ¶ 20; Ex. C, MR 874). On July 31, 2014, Dr. Obaisi requested another follow-up

appointment at UIC Hospital's Rheumatology Clinic. (Ex. B, Henze Decl., ¶ 21; Ex. C, MR 486). The follow-up appointment was approved on August 4, 2014. (Ex. B, Henze Decl., ¶ 21; Ex. C, MR 485).

**RESPONSE: Undisputed.**

21.     On March 3, 2015, Plaintiff was seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (Ex. B, Henze Decl., ¶ 22; Ex. D, UIC 1232). Plaintiff complained about joint pain in his hands (which was worse in the right hand), right wrist and right knee. *Id.* Plaintiff was noted to be taking Procardia for Raynaud's disease, Lisinopril (high blood pressure medication) and Aspirin. *Id.* Plaintiff was also prescribed Methotrexate ("MTX") which is a medication used to treat Rheumatoid Arthritis. *Id.* Plaintiff's MMF was discontinued because Plaintiff was experiencing side-effects and wanted to try other medications. *Id.* After a physical examination, Dr. Volkov noted that Plaintiff had decreased abduction in his shoulders, his knees had a full range of motion and there was no effusion. (Ex. B, Henze Decl., ¶ 22; Ex. D, UIC 1233). Dr. Volkov requested a follow-up appointment (no timeframe) (Ex. B, Henze Decl., ¶ 22; Ex. D, UIC 1234). Abduction refers to arm movement away from the middle of a patient's body. Decreased abduction has no bearing, in a medical context, to a patient's ability or tolerance to being handcuffed behind his back. (Ex. B, Henze Decl., ¶ 22).

**RESPONSE: Undisputed that Plaintiff received the abovementioned medical care, and that Dr. Volkov made such observations and notes. Disputed that Plaintiff's shoulder conditions, whether related to decreased abduction or otherwise, did not increase his risk of injury from being handcuffed behind his back. (Def. Ex. A, Saffold Dep., 80:16-81:9).**

22.     On April 1, 2015, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (Ex. B, Henze Decl., ¶ 23; Ex. C, MR 491). The follow-up appointment was approved on April 7, 2015. (Ex. B, Henze Decl., ¶ 23; Ex. C, MR 490).

**RESPONSE: Undisputed.**

23.     On May 19, 2015, Plaintiff was seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (Ex. B, Henze Decl., ¶ 24; Ex. D, UIC 1228). He continued to experience Raynaud's disease, without ulcerations. Plaintiff was experiencing decreased abduction in both shoulders. The decreased abduction was worse on the left. (Ex. B, Henze Decl., ¶ 24; Ex. D, UIC 1229). Plaintiff also complained about joint pain which was worse in the right hand, left shoulder and right knee. Plaintiff's left shoulder pain was diagnosed as likely caused by arthritis of the glenohumeral joint and rotator cuff tendonitis. He was continued on Procardia (used to treat Raynaud's) Lisinopril and Aspirin. (Ex. B, Henze Decl., ¶ 24; Ex. D, UIC 1231). Plaintiff also received a steroid injection into his left shoulder and left knee. Plaintiff was advised not to do heavy lifting for the next seven to ten days after the shoulder cortisone injection due to concern for tendon tear. *Id.* Dr. Volkov requested a follow-up appointment in three months. (Ex. B, Henze Decl., ¶ 24; Ex. D, UIC 1231).

**RESPONSE: Undisputed.**

24.     On June 1, 2015, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic and a referral for onsite physical therapy. (Ex. B, Henze Decl., ¶ 25; Ex. C, MR 500, 501). The follow-up appointment at UIC was approved on June 9, 2015. (Ex. B, Henze Decl., ¶ 25; Ex. C, MR 499).

**RESPONSE: Undisputed.**

25.     On July 6, 2015, Plaintiff was seen by Dr. Obaisi stating that he was feeling well and he was seen by Rheumatology. Dr. Obaisi found no acute changes in Plaintiff's condition. There are no notations regarding requests for a waist-chain permit in the record. (Ex. B, Henze Decl., ¶ 26; Ex. C, MR 443).

**RESPONSE: Undisputed.**

26.     On August 4, 2015, Plaintiff started participating in physical therapy. He was seen by Jose Becerra who is a physical therapist at Stateville. Plaintiff was treated for pain in his shoulder and knee. (Ex. B, Henze Decl., ¶ 27; Ex. C, MR 445).

**RESPONSE: Undisputed.**

27.     Plaintiff then attended physical therapy sessions on August 13, 2015 (Ex. B, Henze Decl., ¶ 28; Ex. C, MR 447), August 17, 2015, *Id.* August 20, 2015 (Ex. B, Henze Decl., ¶ 28; Ex. C, MR 448), September 10, 2015, September 15, 2015, September 22, 2015, (Ex. B, Henze Decl., ¶ 28; Ex. C, MR 452), September 24, 2015, (Ex. B, Henze Decl., ¶ 28; Ex. C, MR 453), September 28, 2015, and October 1, 2015 (Ex. B, Henze Decl., ¶ 28; Ex. C, MR 454-55). On October 1, 2015, Jose Becerra noted that Plaintiff made excellent gains and discontinued the physical therapy. (Ex. B, Henze Decl., ¶ 28; Ex. C, MR 454-55).

**RESPONSE: Undisputed.**

28.     On August 26, 2015, Plaintiff was seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (Ex. B, Henze Decl., ¶ 29; Ex. D, UIC 1223-26). Plaintiff reported that he was doing physical therapy. *Id.* Plaintiff also claimed that the steroid injection "significantly" helped with his pain. *Id.* He continued to experience Raynaud's disease symptoms, without ulcerations. *Id.* He was continued on Procardia Lisinopril, Aspirin and MTX. *Id.* Plaintiff also complained about left shoulder pain, which was diagnosed as likely caused by arthritis of the glenohumeral joint and rotator cuff tendonitis and was noted to be "resolved/improved today." (Ex. B, Henze Decl., ¶ 29; Ex. D, UIC 1226). Dr. Volkov recommended that Plaintiff continue physical therapy. *Id.* Plaintiff received another steroid injection in his knee. *Id.* Dr. Volkov requested a follow-up appointment in three months. (Ex. B, Henze Decl., ¶ 29; Ex. D, UIC 1226).

**RESPONSE: Undisputed.**

29.    On August 26, 2015, Dr. Obaisi issued Plaintiff permits for low bunk, low gallery, gloves in cold weather for one year. (Ex. C, MR 888).

**RESPONSE: Undisputed that Plaintiff was issued those permits and was not issued a permit for a waist chain by Dr. Obaisi on August 26, 2015.**

30.    On December 8, 2015, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (Ex. B, Henze Decl., ¶ 30; Ex. C, MR 503). The follow-up appointment was approved on December 9, 2015. (Ex. B, Henze Decl., ¶ 30; Ex. C, MR 502). On December 9, 2015, Plaintiff was seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (Ex. D, UIC 1218 - 1221). Plaintiff explained that after the last injection, his knee pain improved. Plaintiff denied joint pain/swelling anywhere else.  He claimed that his symptoms were under good control with current medications. Plaintiff also complained about left shoulder pain, which was diagnosed as likely caused by arthritis of the glenohumeral joint and rotator cuff tendonitis. However, the doctor noted that left shoulder pain was "resolved/improved." Dr. Volkov recommended that Plaintiff perform range of motion and muscle strengthening exercises and showed some of the exercises to Plaintiff. Plaintiff's various medications to treat his conditions were continued. *Id.* Dr. Volkov requested a follow-up in three months. (Ex. B, Henze Decl., ¶ 31; Ex. D, UIC 1221).

**RESPONSE: Undisputed.**

31.    On December 9, 2015, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (Ex. C, MR 505). The follow-up appointment was approved on December 15, 2015. (Ex. B, Henze Decl., ¶ 32; Ex. C, MR 504).

**RESPONSE: Undisputed.**

32. On April 26, 2016, Plaintiff was seen by a nurse and stated that he needs his permit, his lotion and his shampoo renewed. (Ex. B, Henze Decl., ¶ 33; Ex. C, MR 467). The nurse noted that Plaintiff's chart will be presented to a doctor to evaluate if renewals are appropriate, or if further evaluation is needed. (Ex. B, Henze Decl., ¶ 33; Ex. C, MR 467).

**RESPONSE: Undisputed.**

33. On May 16, 2016, Plaintiff was seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (Ex. B, Henze Decl., ¶ 34; Ex. D, UIC 1213 - 1217). Plaintiff stated that he was doing "very well." *Id.* He denied significant joint pain. *Id.* However, he did complain of stiffness after activity in the shoulders. *Id.* Overall, Plaintiff explained that his symptoms were under good control with current medications. Plaintiff also explained that he was doing physical therapy and yoga exercises daily. *Id.* Pertaining to his shoulders, Plaintiff complained of left and right shoulder pain, which was assessed as likely caused by arthritis of the glenohumeral joint and rotator cuff tendonitis. (Ex. B, Henze Decl., ¶ 34; Ex. D, UIC 1217). The doctor noted that the pain "worsened since previous," and recommended physical therapy for shoulder range of motion. *Id.* Dr. Volkov requested another follow-up appointment in three months. (Ex. B, Henze Decl., ¶ 34; Ex. D, UIC 1217).

**RESPONSE: Undisputed.**

34. On May 17, 2016, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (Ex. C, MR 89). The follow-up appointment was approved and Plaintiff was seen at UIC on May 23, 2016. (Ex. B, Henze Decl., ¶ 35; Ex. C, MR 98).

**RESPONSE: Undisputed.**

35. On May 17, 2016, Plaintiff was seen by Dr. Obaisi for post medical writ visit and re-evaluation of permits. Dr. Obaisi noted that Plaintiff's left shoulder abduction was 120

degrees. Plaintiff also declined physical therapy and stated that he will do self-exercise and that he was instructed on the exercises by his Rheumatologist. (Ex. B, Henze Decl., ¶ 36; Ex. C, MR 470).

**RESPONSE: Undisputed.**

36.     Also, on May 17, 2016, Dr. Obaisi re-issued the low bunk and low gallery permits, but not the waist-chain permit. Dr. Obaisi also changed the medical shower permit to daily. Plaintiff was also granted a gloves permit in cold weather. These permits were also issued for one year. (Ex. B, Henze Decl., ¶ 37; Ex. C, MR 892).

**RESPONSE: Undisputed.**

37.     On July 19, 2016, Plaintiff was seen by a nurse complaining of shoulder and wrist pain. Plaintiff stated that he has had pain "since they shook us down." (Ex. B, Henze Decl., ¶ 38; Ex. C, MR 10). Plaintiff was referred to M.D. Sick Call. *Id.* M.D. Sick Call is a medical appointment where an inmate is seen and treated by either a physician or a Physician's Assistant. (Ex. B, Henze Decl., ¶ 38).

**RESPONSE: Undisputed.**

38.     On July 21, 2016, Plaintiff was seen by a Physician's Assistant and told her that "due to a shakedown last week" he had pain in the right shoulder and numbness and tingling in his hand. (Ex. B, Henze Decl., ¶ 39; Ex. C, MR 11). The record does not indicate which hand. *Id.* Plaintiff also complained of pain in both wrists. *Id.* The P.A. noted that both of Plaintiff's wrists were tender to palpation, but had good range of motion. *Id.* Abrasions were noted on both of Plaintiff's wrists and Plaintiff's right wrist was swollen. *Id.* Plaintiff's right shoulder had a decreased range of motion and strength. *Id.* The P.A. diagnosed acute wrist pain and right

shoulder strain. *Id.* The P.A. prescribed Motrin to be taken twice per day for 14 days. (Ex. B, Henze Decl., ¶ 39; Ex. C, MR 11).

**RESPONSE:** **Undisputed.**

39. On August 24, 2016, Plaintiff was seen in nurse sick call and complained that since the incident with the shakedown (Orange Crush) when they forced his hands behind his back, he still has numbness in both hands. Plaintiff admitted that "it was getting better all the time, but it's still occurring." (Ex. B, Henze Decl., ¶ 40; Ex. C, MR 14).

**RESPONSE:** **Undisputed.**

40. On September 19, 2016, Plaintiff was again seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (Ex. B, Henze Decl., ¶ 41; Ex. D, UIC 1209-1212). Plaintiff said that overall he was doing well. *Id.* However, he complained of decreased range of motion in his shoulders, which was worse on the left. *Id.* Plaintiff also admitted that he was still lifting weights. *Id.* Specifically, the medical record states, "still lifting weights (stopped it 3m ago) but having had time to lift it. (Ex. B, Henze Decl., ¶ 41; Ex. D, UIC 1209). Plaintiff also complained about being handcuffed for four hours, and ever since he has intermittent numbness and tingling in the fingertips. *Id.* Regarding the finger numbness, Plaintiff was diagnosed with carpal tunnel syndrome and was recommended to use a wrist brace at night. (Ex. B, Henze Decl., ¶ 41; Ex. D, UIC 1211). If the carpal tunnel was not well controlled next time, the doctor was going to consider prescribing gabapentin (medication used to treat nerve pain). *Id.* Regarding Plaintiff's shoulders, Dr. Volkov noted that Plaintiff's pain was likely due to a combination of arthritis in the glenohumeral joint and rotator cuff tendonitis. (Ex. B, Henze Decl., ¶ 41; Ex. D, UIC 1212). Plaintiff was encouraged to stop heavy weight lifting and have physical therapy. *Id.* The physical therapy was recommended to increase the range of motion in

Plaintiff's shoulders. *Id.* Dr. Volkov requested a follow-up appointment in three months. (Ex. B, Henze Decl., ¶ 41; Ex. D, UIC 1212).

**RESPONSE: Undisputed.**

41. Dr. Volkov also testified that even though Plaintiff made subjective complaints regarding being handcuffed for four hours, her diagnosis was "a condition of the shoulder that is involving joint and tendon, that it's an ongoing issue." (Ex. E, Volkov Dep., 29:6-31:8). Notably, Dr. Volkov's diagnosis was the same as her diagnosis formulated during appointments which occurred prior to the incident. *Id.* Dr. Volkov's diagnosis did not change based on Plaintiff's subjective complaints. *Id.* Plaintiff was not being treated for an acute injury. *Id.* He was treated for a chronic condition that was present prior to July 2016. *Id.*

**RESPONSE: Disputed. Dr. Volkov indicated that, while Plaintiff was still suffering from ongoing issues, she also "wanted him to have the MRI of the shoulder to evaluate for the tear." (Dkt. 94, Ex. C, Volkov Dep., 35:10-16; *see also* Def. Ex. D, UIC 1209). She also noted a decrease in Plaintiff's left shoulder abduction, from 60 degrees to 45 degrees, (Def. Ex. D, UIC 1211) and diagnosed Plaintiff with carpal tunnel syndrome for the first time. (*Id.*).**

42. On September 20, 2016, Dr. Obaisi saw Plaintiff and noted that a "nightly wrist brace was advised" by Dr. Volkov, and issued a low bunk, low gallery, and bilateral wrist brace permits for one year. (Ex. B, Henze Decl., ¶ 42; Ex. C, MR 17, 895). On the same date, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (Ex. B, Henze Decl., ¶ 42; Ex. C, MR 104). The follow-up appointment was approved on September 25, 2017. (Ex. B, Henze Decl., ¶ 42; Ex. C, MR 105).

**RESPONSE: Undisputed.**

43. On October 26, 2016, Plaintiff was seen in physical therapy for an initial evaluation. After the physical examination, Physical Therapist Jose Beccera recommended eight

sessions of physical therapy at a rate of 1 or 2 per week. (Ex. B, Henze Decl., ¶ 43; Ex. C, MR 19-20).

**RESPONSE: Undisputed.**

44.     Plaintiff completed physical therapy sessions on November 3, 2016; November 10, 2016; November 17, 2016; November 24, 2016; December 1, 2016; December 8, 2016; December 15, 2016; December 23, 2016; and, January 4, 2017. He was discharged on January 4, 2017. (Ex. B, Henze Decl., ¶ 44; Ex. C, MR 20-23, 27).

**RESPONSE: Undisputed.**

45.     On January 5, 2017, Plaintiff was seen by the P.A. LaTanya Williams for complaints of intermittent pain and intermittent tingling of the left shoulder at night. (Ex. B, Henze Decl., ¶ 45; Ex. C, MR 26). P.A. Williams ordered an x-ray of Plaintiff's shoulder. *Id.* The x-ray was taken on January 9, 2017, and disclosed moderate degenerative joint disease in the left shoulder. The right shoulder had negative findings except for a bullet. (Ex. B, Henze Decl., ¶ 45; Ex. C, MR 336). Plaintiff was again seen by the P.A. on January 30, 2017, and informed of the results of the x-ray. (Ex. B, Henze Decl., ¶ 45; Ex. C, MR 29).

**RESPONSE: Undisputed.**

46.     On April 3, 2017, Plaintiff was again seen at UIC Hospital in the Rheumatology Clinic by Dr. Volkov as a follow-up. (Ex. B, Henze Decl., ¶ 46; Ex. D, UIC 1204-1207). Plaintiff complained of still having issues with both shoulders, more with the left shoulder. (Ex. B, Henze Decl., ¶ 46; Ex. D, UIC 1204). Plaintiff complained of decreased range of motion and pain in his shoulder. *Id.* Plaintiff further stated that he decreased repetition in terms of weightlifting to 225 lbs once a week. *Id.* Plaintiff was diagnosed with stable bilateral carpal tunnel syndrome and encouraged to use a brace. (Ex. B, Henze Decl., ¶ 46; Ex. D, UIC 1207).

Plaintiff's left and right shoulder pain was again diagnosed as a combination of arthritis of the glenohumeral joint and rotator cuff tendonitis. *Id.* The doctor also requested an MRI of the shoulder without contrast to evaluate for left shoulder tear. *Id.* Finally, the doctor asked that Plaintiff refrain from weightlifting. *Id.* Dr. Volkov requested a follow-up appointment in three months. (Ex. B, Henze Decl., ¶ 46; Ex. D, UIC 1207).

**RESPONSE: Undisputed.**

47.     On April 4, 2017, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (Ex. B, Henze Decl., ¶ 47; Ex. C, MR 96). The follow-up appointment was approved on April 11, 2016. (Ex. B, Henze Decl., ¶ 47; Ex. C, MR 95). Additionally, on April 11, 2017, Dr. Obaisi participated in a Collegial Review Conference with Dr. Ritz and the MRI of Plaintiff's left shoulder was approved. (Ex. B, Henze Decl., ¶ 48; Ex. C, MR 97).

**RESPONSE: Undisputed.**

48.     On August 7, 2017, Plaintiff was seen by Dr. Volkov at UIC Hospital. (Ex. B, Henze Decl., ¶ 49; Ex. D, UIC 1199-1203). Plaintiff again complained of pain and decreased range of motion with both shoulders. (Ex. B, Henze Decl., ¶ 49; Ex. D, UIC 1199). The left shoulder bothered him more than the right. *Id.* Plaintiff claimed that he cannot lift weights anymore. *Id.* Additionally, there was no room in his cell to do exercises and he wasn't doing them anymore. *Id.* At this time, Plaintiff still did not receive his MRI. *Id.* Plaintiff was again diagnosed with stable bilateral carpal tunnel syndrome and encouraged to use a brace at night. (Ex. B, Henze Decl., ¶ 49; Ex. D, UIC 1202). Plaintiff's left and right shoulder pain was again diagnosed as a combination of arthritis of the glenohumeral joint and rotator cuff tendonitis. *Id.* The doctor also requested an MRI of the shoulder without contrast to evaluate for left shoulder

tear. *Id.* Finally, Dr. Volkov again asked that Plaintiff continue to refrain from weightlifting. (Ex. B, Henze Decl., ¶ 49; Ex. D, UIC 1202).

**RESPONSE: Undisputed.**

49.     On August 9, 2017, Plaintiff was seen by Dr. Obaisi for a post-medical writ appointment, and Dr. Obaisi noted that the MRI had not been done yet at UIC. (Ex. B, Henze Decl., ¶ 50; Ex. C, MR 46).

**RESPONSE: Undisputed.**

50.     On August 31, 2017, Plaintiff was seen by Dr. Obaisi for permit renewal and the doctor issued low bunk, low gallery, and bilateral wrist brace permits for one year. (Ex. B, Henze Decl., ¶ 51; Ex. C, MR 49, 369).

**RESPONSE: Undisputed.**

51.     On September 14, 2017 the UIC medical records contain an addendum stating that UIC received a phone call from Barbara Johnson requesting that an order be entered for MRI as recommended by Dr. Volkov. (Ex. B, Henze Decl., ¶ 52; Ex. D, UIC 1199).

**RESPONSE: Undisputed.**

52.     On September 18, 2017, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (Ex. B, Henze Decl., ¶ 53; Ex. C, MR 99). The follow-up appointment was approved on September 25, 2017. (Ex. B, Henze Decl., ¶ 53; Ex. C, MR 105). Additionally, September 25, 2017, Collegial Review conference record noted that Plaintiff's MRI was approved on April 11, 2017, but had not yet been completed. (Ex. B, Henze Decl., ¶ 53; Ex. C, MR 105).

**RESPONSE: Undisputed.**

53.     UIC Hospital records contain a notation that Plaintiff's shoulder MRI was cancelled on October 6, 2017. (Ex. B, Henze Decl., ¶ 54; Ex. D, UIC 1332). On the same date, a Stateville Transfer Summary Form contained a notation that Plaintiff needed x-ray images of previous bullet wounds before an MRI can be completed. (Ex. B, Henze Decl., ¶ 54; Ex. C, MR 51). Cancelling Plaintiff's MRI was appropriate if Plaintiff still had bullet fragments in his body. The use of an MRI machine, which is essentially a very powerful magnet, is absolutely incompatible for anyone who has bullet fragments in their body. (Ex. B, Henze Decl., ¶ 54).

**RESPONSE: Undisputed that Plaintiff's MRI was canceled due to the presence of bullet fragments. Disputed that an MRI is "absolutely incompatible for anyone who has bullet fragments in their body," as Dr. Volkov indicated that the presence of bullets would only have "probably" (not "absolutely") resulted in her requesting a different scan. (Dkt. 94, Ex. C, Volkov Dep., 37:20-23).**

54.     On October 10, 2017, Dr. Obaisi issued Plaintiff a low bunk, low gallery, and waist-chain permits for one year. (Ex. B, Henze Decl., ¶ 55; Ex. C, MR 370). However, the waist-chain permits were only issued for when Plaintiff left the prison on writs. *Id.* Dr. Obaisi also issued Plaintiff permits for bilateral wrist braces, and an extra roll of toilet paper. (Ex. B, Henze Decl., ¶ 55; Ex. C, MR 370).

**RESPONSE: Undisputed.**

55.     On October 17, 2017, Plaintiff was seen at UIC Hospital Rheumatology Clinic for a follow-up. (Ex. B, Henze Decl., ¶ 56; Ex. D, UIC 1193-1198). Plaintiff again complained of pain and decreased range of motion with both shoulders. (Ex. B, Henze Decl., ¶ 56; Ex. D, UIC 1193). Left shoulder bothered him more than the right. Dr. Volkov again diagnosed that Plaintiff's shoulder pain was a "likely combination of arthritis in glenohumeral joint and rotator cuff tendonitis. (Ex. B, Henze Decl., ¶ 56; Ex. D, UIC 1197). Dr. Volkov ordered an x-ray report from Plaintiff's primary care doctor (Dr. Obaisi) and also ordered a left shoulder CT without

contrast. (Ex. B, Henze Decl., ¶ 56; Ex. D, UIC 1197). No record could be located explaining the change from MRI to CT, but a reasonable explanation is that due to Plaintiff having bullets in his body, an MRI could not have been taken. Finally, Dr. Volkov requested a follow-up appointment in three months. (Ex. B, Henze Decl., ¶ 56; Ex. D, UIC 1197).

**RESPONSE: Undisputed.**

56.　　On October 17, 2017, Dr. Obaisi requested another follow-up appointment at UIC Hospital's Rheumatology Clinic. (Ex. B, Henze Decl., ¶ 57; Ex. C, MR 127). The follow-up appointment was approved on October 25, 2017. (Ex. B, Henze Decl., ¶ 57; Ex. C, MR 126).

**RESPONSE: Undisputed.**

57.　　Additionally, on October 17, 2017, Dr. Obaisi requested a Collegial Review conference for a CT scan of Plaintiff's left shoulder. (Ex. B, Henze Decl., ¶ 58; Ex. C, MR 114). The Collegial Review conference was held on October 25, 2017, and the CT scan was approved. (Ex. B, Henze Decl., ¶ 58; Ex. C, MR 113).

**RESPONSE: Undisputed.**

58.　　On October 18, 2017, x-rays of Plaintiff's shoulder, groin, thigh and rib cage were taken and showed that Plaintiff had bullets in his right proximal arm, right upper chest wall, and in mid-thigh. (Ex. B, Henze Decl., ¶ 59; Ex. C, MR 337).

**RESPONSE: Undisputed.**

59.　　On March 6, 2018, Plaintiff was issued low bunk, low gallery, daily shower, and bilateral wrist brace permits. The permits were issued for six months. The corresponding progress note only states that there was a follow-up for a permit renewal. (Ex. B, Henze Decl., ¶ 60; Ex. C, MR 372).

**RESPONSE: Undisputed.**

60.     On April 23, 2018, Plaintiff had a CT scan of his left shoulder. (Ex. B, Henze Decl., ¶ 61; Ex. D, UIC 1387). The findings were "marked degenerative changes." *Id.* There was no large full-thickness retracted rotator cuff tear visualized. Partial tear or patella full-thickness tear was difficult to exclude by CT technique. (Ex. B, Henze Decl., ¶ 61; Ex. D, UIC 1387).

**RESPONSE: Undisputed.** *See also* **Dkt. 94, Ex. C, Volkov Dep., 42:10-16.**

61.     On August 6, 2018, Plaintiff was seen at UIC Hospital Rheumatology Clinic for a follow-up by Dr. Volkov. (Ex. B, Henze Decl., ¶ 62; Ex. D, UIC 1187- 1192). Plaintiff stated that his overall symptoms remained at the same level of severity since his last visit. *Id.*  He still had intermittent swelling and joint pain. *Id.* Plaintiff also explained that he completed physical therapy. *Id.* Finally, Plaintiff wanted to know the results of the CT scan. *Id.* Dr. Volkov noted the following pertaining to Plaintiff's rotator cuff: "no full thickness or partial tear – no need for sx (surgery)." Plaintiff was advised to restart Hydroxychloroquine (HCQ) (medication used to treat rheumatoid arthritis, among other uses). Dr. Volkov requested a follow-up appointment in three months. (Ex. B, Henze Decl., ¶ 62; Ex. D, UIC 1192).

**RESPONSE: Undisputed.**

62.     On August 14, 2018, Dr. Okezie participated in a Collegial Review conference to refer Plaintiff to an Orthopedist for an evaluation of his left shoulder complaints. (Ex. B, Henze Decl., ¶ 63; Ex. C, MR 121). The request was not approved, in favor of an alternative treatment plan to treat Plaintiff on site and restart HCQ medication as was recommended by Dr. Volkov. (Ex. B, Henze Decl., ¶ 63; Ex. C, MR 121).

**RESPONSE: Undisputed.**

63.     Dr. Okezi also participated in a Collegial Review conference to refer Plaintiff for a follow-up at the Rheumatology Clinic. On August 14, 2018, the referral was approved. (Ex. B, Henze Decl., ¶ 64; Ex. C, MR 123).

**RESPONSE: Undisputed.**

64.     On October 5, 2018, Dr. Henze issued Plaintiff a waist-chain permit, but only when he left prison on a writ. (Ex. B, Henze Decl., ¶ 65; Ex. C, MR 378). The permit was issued to keep Plaintiff comfortable because transfers outside the prison take a long time. (Ex. B, Henze Decl., ¶ 65). The permit was not issued because Dr. Henze was concerned that if Plaintiff is cuffed normally he would experience any type of injury. (Ex. B, Henze Decl., ¶ 65).

**RESPONSE: Undisputed.**

65.     On November 26, 2018, Plaintiff was seen at UIC Hospital Rheumatology Clinic for a follow-up by Dr. Volkov. (Ex. B, Henze Decl., ¶ 66; Ex. D, UIC 1181 - 1186). Plaintiff stated that his joint pain has improved since he restarted HCQ. *Id.* Plaintiff's CT was reviewed and the doctor noted that Plaintiff's shoulder pain was noted as "likely multifactorial cause of pain." *Id.* Dr. Volkov also noted that Plaintiff was already scheduled for a follow-up with orthopedics. (Ex. B, Henze Decl., ¶ 66; Ex. D, UIC 1185).

**RESPONSE: Undisputed.**

66.     On December 4, 2018, Dr. Henze saw Plaintiff for a medical evaluation post medical writ to UIC Hospital. (Ex. B, Henze Decl., ¶ 67; Ex. C, MR 893). Dr. Henze reviewed Plaintiff's medical records from UIC, and based on Dr. Volkov's assumption that Plaintiff was already scheduled for an orthopedic evaluation, Dr. Henze treated that notation as a recommendation for an orthopedic consult. Consequently, Dr. Henze requested a Collegial Review Conference for an orthopedic evaluation "due to a tear in the left shoulder." *Id.* The

22

"tear in the shoulder" notation was not Dr. Henze's diagnosis of Plaintiff's shoulder condition, but rather her understanding of Dr. Volkov's concerns and the reasons she recommended an orthopedic consult. (Ex. B, Henze Decl., ¶ 67). Since Dr. Volkov recommended an orthopedic evaluation, Dr. Henze assumed that the recommendation was made due to a concern of some sort of a tendon tear in Plaintiff's shoulder. (Ex. B, Henze Decl., ¶ 67).

**RESPONSE: Undisputed.**

67.    On December 11, 2018, Dr. Henze and Dr. Ritz participated in a Collegial Review Conference regarding referring Plaintiff For an evaluation by an Orthopedist. (Ex. B, Henze Decl., ¶ 68; Ex. C, MR 894). The doctors noted that according to the CT scan taken on April 23, 2018, Plaintiff had advanced degenerative changes in his shoulder, and the referral for an orthopedic evaluation was approved. (Ex. B, Henze Decl., ¶ 68).

**RESPONSE: Undisputed.**

68.    On May 6, 2019, Plaintiff was seen at UIC Hospital Rheumatology Clinic for a follow-up by Dr. Volkov. (Ex. B, Henze Decl., ¶ 69; Ex. D, UIC 1175–1180). Plaintiff complained that he ran out of MTX three weeks ago and developed a flare including pain, swelling and "tongue bumps." *Id.*  Plaintiff also claimed that while he was on MTX he was feeling fine. *Id.* He felt that his symptoms were controlled. *Id.* On physical examination, it was noted that Plaintiff had limited range of motion in his shoulders, (left shoulder worse than the right shoulder). *Id.* Another portion of the medical record stated that Plaintiff actually restarted MTX one week ago. *Id.* Plaintiff's shoulder pain was noted as "likely multifactorial cause of pain." (Ex. D, UIC 1179). Plaintiff still had not seen an Orthopedist, but was hopeful to see one soon. (Ex. B, Henze Decl., ¶ 69; Ex. D, UIC 1179).

**RESPONSE: Undisputed.**

69.     On May 13, 2019, Plaintiff was seen at UIC Hospital by Orthopedist Dr. Benjamin Goldberg. (Ex. B, Henze Decl., ¶ 70; Ex. D, UIC 337-338). Plaintiff complained about pain which was exacerbated by any type of movement. *Id.* Plaintiff claimed that he tried physical therapy without any relief. *Id.* After a physical examination and reviewing the April 23, 2018, CT scan, Dr. Goldberg noted that the scan demonstrated severe degenerative changes with subchondral cysts and profound collar osteophyte formation. *Id.* Dr. Goldberg further noted that Plaintiff's physical examination was consistent with a "likely rotator cuff tear." *Id.* Consequently, Dr. Goldberg proposed, and Plaintiff agreed to proceed with "left reverse total shoulder arthroplasty," which is commonly referred to as a shoulder replacement surgery. *Id.* Plaintiff's surgery was scheduled for July 9, 2019. *Id.* There are no indications in the medical record that the surgery was necessitated by anything other than Plaintiff's degenerative shoulder condition. *Id.* Furthermore, there were no notations in the medical record that Plaintiff's "likely rotator cuff tear" was caused by anything other than a chronic degenerative condition. (Ex. B, Henze Decl., ¶ 70).

**RESPONSE: Undisputed that Plaintiff was seen at UIC Hospital by Dr. Benjamin Goldberg on May 13, 2019, that his pain was exacerbated by movement, that physical therapy did not provide relief, that the CT scan demonstrated degenerative changes, and that Plaintiff's condition was consistent with a "likely rotator cuff tear." Disputed that the surgery was not necessitated by anything other than Plaintiff's degenerative condition. The medical record itself indicates that Plaintiff's condition was consistent with a tear, (Def. Ex. D, UIC, 338), that doctors first began looking for a tear after Plaintiff reported increased pain and worsening condition after the July 12, 2016 incident, (Def. Ex. D, UIC 1209), and that the CT scan performed on Plaintiff could not rule out a tear. (Def. Ex. D, UIC, 1387).**

70.     On July 8, 2019, Dr. Golberg entered a medical record stating that Plaintiff was scheduled for shoulder surgery on July 9, 2019, but, unfortunately, the doctor had to add two emergency cases and Plaintiff's surgery would have to be moved to October 7, 2019. (Ex. B, Henze Decl., ¶ 71; Ex. D, UIC 488).

**RESPONSE: Undisputed.**

71.     On December 2, 2019, Plaintiff was seen by Dr. Goldberg for a left reverse shoulder arthroplasty. (Ex. D, UIC 474-76). The pre-operative and post-operative diagnosis was left shoulder end-stage arthritis. *Id.* Plaintiff tolerated the surgery well and without complications. There are no notations in the operative report that indicates that Plaintiff had a torn shoulder tendon. *Id.* Moreover, there are no indications in the operative report that the surgery was necessitated by anything other than Plaintiff's degenerative shoulder condition. (Ex. B, Henze Decl., ¶ 72; Ex. D, UIC 474-76).

**RESPONSE: Undisputed that the surgery was performed as described and that no such indications were present in the specified operative report. Disputed that the surgery could not have been necessitated by anything other than Plaintiff's degenerative shoulder condition. It is the role of the jury to decide the facts in this case.**

72.     Although Dr. Goldberg suspected a rotator cuff tear prior to surgery, after an actual visual examination of Plaintiff's shoulder tissues, no tear was noted in the operative report. (Ex. B, Henze Decl., ¶ 73).

**RESPONSE: Undisputed that no such tear was noted in the specified operative report. Disputed that a lack of such a note contradicts Dr. Goldberg's suspicion of a tear prior to the surgery or forecloses the possibility that a tear was present. It is the role of the jury to decide the facts in this case.**

## DR. HENZE'S UNCHALLENGED MEDICAL OPINION

73.     Dr. Obaisi's medical treatment of this patient complied with the applicable community standard of medical care. (Ex. B, Henze Decl., ¶ 75).

**RESPONSE: Disputed. Dr. Obaisi knew that Plaintiff had shoulder conditions that necessitated special protections. (Def. Ex. C, MR 862, 867, 874). On July 12, 2016, Plaintiff was handcuffed behind his back, causing him to suffer a significant injury that caused him pain and necessitated extensive medical treatment. This incident happened after Dr. Obaisi ceased issuing Plaintiff waist chain permits that would have prevented such injury, and Dr. Obaisi knew that Plaintiff needed a waist chain permit to reduce the risk of further damage to his shoulders.**

74.     While treating Plaintiff, Dr. Obaisi consistently followed the recommendations of Dr. Volkov and referred Plaintiff for follow-up appointments and physical therapy. Following the recommendations of a Rheumatologist complied with the applicable community standard of medical care for the treatment of a patient with Plaintiff's conditions. (Ex. B, Henze Decl., ¶ 76).

**RESPONSE: Disputed that Dr. Obaisi adequately provided the necessary care for Plaintiff based on Dr. Volkov's recommendations. Because Dr. Volkov "would not dare to make any recommendation [that Plaintiff be given a waist chain permit or not be handcuffed behind his back]," (Dkt. 94, Ex. C, Volkov Dep., 52:19-53:3), Dr. Volkov was not in a position to determine aspects of Plaintiff's care that are specific to the conditions of his incarceration. While Dr. Volkov could, for example, advise Plaintiff not to lift heavy weights, (Volkov Dep., 29:14-15, 34:9-10), she was not in a position to advise Plaintiff to avoid being handcuffed behind his back with a single pair of handcuffs.**

75.     Dr. Obaisi's and Dr. Henze's medical treatment did not cause any harm to Plaintiff. All decisions to either grant or not grant medical permits to Plaintiff complied with the applicable community standard of medical care. (Ex. B, Henze Decl., ¶ 77).

**RESPONSE: Disputed. It is the role of the jury to decide the facts in this case, including as to causation.**

76.     There is no medical evidence that Plaintiff's degenerative shoulder condition required the issuance of a waist-chain permit. There is no medical evidence that Plaintiff was injured as a result of being handcuffed behind his back during the IDOC's tactical team "shakedown" which occurred on July 12, 2016. According to the medical records Plaintiff was always treated for his degenerative shoulder condition. Any changes in Plaintiff's medical treatment are due to the progression of his chronic condition and not due to any acute injury. (Ex. B, Henze Decl., ¶¶ 78-80).

**RESPONSE: Disputed. It is the role of the jury to decide the facts in this case, including as to causation. There is myriad evidence that Plaintiff was injured as a result of being handcuffed during the "shakedown" on July 12, 2016, including Defendant's own recognition (in ¶ 38, *supra*) that, in the days after the shakedown, the physician assistant who examined Plaintiff "noted that both of Plaintiff's wrists were tender to palpation." Abrasions were noted on both of Plaintiff's wrists and Plaintiff's right wrist was swollen.**

**Plaintiff's right shoulder had a decreased range of motion and strength. The P.A. diagnosed acute wrist pain and right shoulder strain." (*See also* Def. Ex. C, MR 11). Plaintiff's medical condition changed after the incident, and the determination of the extent of the damage caused by the shakedown is the exact type of factual issue that must be resolved by the jury.**

### DR. VOLKOV'S UNCHALLENGED MEDICAL OPINION

77.     If Dr. Volkov thought that Plaintiff being handcuffed behind his back could injure him, she would have made a notation in the records requesting a different type of handcuffing if there is an option to handcuff in a different way. (Ex. E, Volkov Dep. 52:12-53:12). No such notations exist. (*See generally* Ex. D).

**RESPONSE: Disputed. Dr. Volkov made clear that she would only make such a notation if she knew that Plaintiff was being handcuffed behind his back and it was causing him pain. There was no indication that she had such information, and could not even recall if she had personally seen Plaintiff handcuffed behind his back. (Dkt. 94, Ex. C, Volkov Dep., 19:21-20:4). Moreover, she indicated that even if she thought Plaintiff being handcuffed behind his back was a "serious medical issue," she still wouldn't necessarily recommend any change in the practice. (*Id*. at 20:9-15).**

78.     Pertaining to the CT scan of Plaintiff's shoulder taken on April 23, 2018, Dr. Volkov testified that Plaintiff had a lot of changes to the joint that could potentially related to rheumatoid arthritis and osteoarthritis. Plaintiff had two conditions tendonitis and rheumatoid arthritis. The osteoarthritic changes were permanent. Dr. Volkov further testified that Plaintiff's condition was not caused by an acute event (i.e. being handcuffed behind his back), but rather by a chronic condition which occurred before July 2016.  (Ex. E, Volkov Dep. 43:6-45:7).

**RESPONSE: Undisputed that Dr. Volkov testified that Plaintiff had changes to his left shoulder joint that could potentially be related to rheumatoid arthritis or chronic tendonitis, and that the osteoarthritic changes were permanent. Disputed that Dr. Volkov testified that Plaintiff's condition was not caused by an acute act such as being violently handcuffed behind his back on July 12, 2016. In fact, she explicitly declined to answer that question, saying she is more focused on the "disease itself." (Dkt. 94, Ex. C, Volkov Dep., 44:9-17). Dr. Volkov further indicated that there could be non-degenerative reasons for Plaintiff's worsening shoulder condition. (*Id.* at 32:6-15, discussing weightlifting).**

79.     Dr. Volkov explained that after reading the CT scan report, she noted that Plaintiff's cause of pain in his shoulder is "likely multifactorial." The factors were rheumatoid arthritis, inflammation of the tendon and osteoarthritis. These were all chronic conditions. As these conditions progress they could cause a shoulder tendon tear to happen. (Ex. E, Volkov Dep. 45:8-24).

**RESPONSE: Undisputed that Dr. Volkov believed the causes of Plaintiff's shoulder pain to be "likely multifactorial," including rheumatoid arthritis, inflammation of the tendon, and osteoarthritis, and that those conditions can be chronic. Disputed that osteoarthritis is only a chronic condition, as it can be caused by injury or inflammation. (Dkt. 94, Ex. C, Volkov Dep., 50:22-51:2). Further disputed that this testimony forecloses the additional possibility that existing underlying conditions were accelerated or exacerbated by an acute injury, or that they are unchallenged explanations for a potential tear to Plaintiff's shoulder. (*See* Def. Ex. B, Saffold Dep., 92:5-6).**

## PLAINTIFF'S ADMISSION

80.     Plaintiff has no evidence that any doctor has noted that his shoulder pain was cause by being handcuffed. (Ex. A, 102:24-103:3). In his deposition, Plaintiff was asked if a doctor mentioned in a medical record that [his] shoulder pain was caused by [him] being handcuffed." *Id.* Plaintiff responded, "No, I haven't talked to no doctor." *Id.*

**RESPONSE: Undisputed that Plaintiff said the above statements at his deposition.**

Respectfully submitted,

/s/ Lawrence Jackowiak
*Counsel for Plaintiff*

Jackowiak Law Offices
111 W Washington St, Ste 1500
Chicago, IL 60602
(312) 795-9595
LJ@JackowiakLaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 5, 20221, I electronically filed the foregoing document with the clerk of the court for Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

<u>/s/ Lawrence V. Jackowiak</u>