THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT SAFFOLD, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 3301 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, et al., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

In December 2018, Plaintiff Robert Saffold filed an Amended Complaint against several Illinois Department of Corrections ("IDOC") employees – including Warden Randy Pfister, Lieutenant Officer Daniel Artl, and Correctional Officer Christopher Medin (together, the "IDOC Defendants"), and the estate of his treating physician, Dr. Saleh Obaisi ("the Estate" or "Obaisi") who is now deceased. (Dkt. 26). Saffold alleges that Defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment during a Stateville facility shakedown and that he was injured as a result. (*Id.* ¶¶ 58–66). Before the Court are the Defendants' dual motions for summary judgment on the basis of Saffold's failure to exhaust his administrative remedies and to establish deliberate indifference. (Dkts. 90, 93). For the following reasons, Defendants' motions [90, 93] are granted.

## BACKGROUND

### A.     Saffold's Underlying Health Conditions

Plaintiff Robert Saffold is a 53-year-old inmate housed within IDOC's Stateville Correctional Center ("Stateville"). (Dkt. 110 ¶ 3; Dkt. 91-4 at 337). Since at least 2010, Saffold

1

has suffered from several medical conditions: undifferentiated connective tissue disease (a type of autoimmune disease), arthritis, Raynaud's Disease (a condition that restricts blood vessels and blood flow usually in the fingers and toes), and synovitis (inflammation of the tissues that line a joint). (Dkt. 111 ¶ 10). (Dkt. 111 ¶ 10). These conditions affect Saffold's shoulders, causing him chronic pain and limiting his range of motion. (*E.g.*, *id.* ¶ 23 (describing Saffold's diagnosis of and treatment for arthritis of the glenohumeral joint and rotator cuff tendonitis)). He continuously received care for these conditions from IDOC medical personnel and specialists from the University of Illinois in Chicago Hospital ("UIC") over the course of many years. (*See generally id.* ¶¶ 14–72). Saffold's attending physicians included Dr. Obaisi, who also previously served as Stateville's Medical Director, and Dr. Suncica Volkov ("Volkov"), who is a rheumatologist at UIC's Rheumatology Clinic. (Dkt. 26 ¶ 13; Dkt. 111 ¶¶ 8, 11).

To alleviate discomfort due to his health conditions, Saffold received medical permits at various times throughout his treatment from Stateville's Medical Directors. (Dkt. 111 ¶ 12). A medical permit grants certain privileges not usually provided to the general inmate population. (*Id.*). For example, some medical permits allow: (1) inmates to reside on a low gallery of a cell house (thereby alleviating the need to climb stairs); (2) inmates to sleep on a lower bunk in a cell (thereby eliminating the need to climb on a top bunk); or (3) a modification from the normal shackling procedures, including by requiring use of waist chain restraints (sometimes inside the prison and sometimes only on extended travel outside the prison). (*Id.* ¶ 12). Dr. Obaisi and others routinely issued these permits to Saffold during the time relevant to this litigation. (*E.g.*, *id.* ¶ 12). However, there were intermittent periods of time during which Saffold went without certain medical permits, including permits for waist chain restraints. (*Compare id.* ¶ 16 (granting Saffold one-year waist chain permit on September 26, 2013), *and id.* ¶ 54 (same on October 10, 2017, but

2

only for when Saffold left Stateville on writs), *with id.* ¶ 36 (not granting Saffold waist chain permit on May 17, 2016 – Saffold's last visit prior to the July 12, 2016 shakedown), and ¶ *id.* 42 (same on September 20, 2016)).  When Saffold lacked a waist chain permit, Stateville officers would usually use "two pairs of handcuffs" on him, instead of one, because he is a "big guy." (Dkt. 122 ¶ 7).  Regular restraints in a prison closely resemble handcuffs.  (Dkt. 111 ¶ 13).  When these restraints are utilized appropriately, an inmate is restrained with both hands behind his back.  (*Id.*).  In certain medical circumstances, an inmate may require a waist chain permit calling for non-standard restraints to be applied to an inmate.  (*Id.*).  A waist chain works to restrain an inmate without placing their hands behind their back.  (*Id.*).  A leather restraint is another type of restraint used to control inmates without placing their hands behind their backs.  (*Id.*).

## B.    Saffold's Medical Treatment at Stateville

Saffold first experienced issues with his shoulders in or around 2009 – when, while he was weightlifting, someone dropped a weight and injured his right rotator cuff.  (Dkt. 110 ¶ 72).  In that same year, Saffold began receiving treatment from Dr. Volkov at UIC for his shoulder.  (*Id.* ¶ 61).  Plaintiff began specifically complaining about his decreased range of motion in his shoulders in 2012.  (*Id.* ¶ 63).  Saffold regularly visited with Dr. Obaisi to monitor and treat his shoulder conditions.  (*E.g.*, Dkt. 111 ¶ 25, 35, 42, 49–50).  In addition, between 2013 and 2018, Dr. Obaisi referred Saffold for appointments with UIC's Rheumatology Clinic on at least eleven occasions to receive medical care.  (*Id.* ¶¶ 15, 20, 22, 24, 30, 31, 34, 42, 47, 52, 56).  Saffold secured no fewer than sixteen visits with treating rheumatologists, including Dr. Volkov, in those years.  (*Id.* ¶¶ 18, 21, 23, 25, 28, 30, 31, 33, 34, 40, 46, 48, 55, 61, 65, 68).  UIC doctors prescribed Saffold medicine and generally monitored his shoulder health over time.  (*E.g.*, *id.* ¶ 23).  Dr. Obaisi actively communicated with UIC about Saffold's treatment and aligned his own care with Dr. Volkov's

recommendations. (*Id.* ¶ 74). He also consistently referred Saffold for physical therapy appointments, (*id.* ¶ 74), and partook in collegial review conferences with other doctors to develop appropriate plans of care for Saffold, (*id.* ¶¶ 15, 47, 57).

Throughout these years of medical treatment, Dr. Volkov noted that Saffold's weightlifting was a risk factor for a tear in his shoulder tendon and likely made his tendon inflammation worse. (Dkt. 110 ¶ 74). Dr. Volkov therefore advised Plaintiff to stop weightlifting several times. (*Id.*). For example, Dr. Volkov saw Saffold on September 19, 2016 – after the shakedown – and Saffold admitted that he was still lifting weights. (Dkt. 111 ¶ 40). Dr. Volkov therefore encouraged him to stop heavy weightlifting. (*Id.*). On April 3, 2017, Saffold stated that he "decreased repetition in terms of weightlifting to 225lbs once a week." (*Id.* ¶ 46). Dr. Volkov again asked him to refrain from weightlifting. (*Id.*). Finally, on August 7, 2017, Plaintiff stated that he was no longer able to lift weights, and Dr. Volkov repeated her request that he refrain from this activity altogether. (*Id.* ¶ 48).

## C.     The July 12, 2016 Shakedown

On July 12, 2016, IDOC's Statewide Tactical Unit ("TACT") conducted a facility-wide shakedown operation at Stateville. (Dkt. 110 ¶ 6). Saffold was restrained by TACT during this event. (Dkt. 122 ¶ 7). When the officers arrived to his cell, Saffold informed the TACT officers that he was could not be handcuffed behind his back due to his shoulder pain. (*Id.*). Saffold did not have a medical permit for waist chains or any other alternative form of restraints at this time. (*Id.* ¶ 22). Instead, Saffold showed them other paperwork showing that he had been to a medical appointment and that paperwork contained a medical status that he had limited range of motion in his shoulders. (*Id.* ¶ 7). Saffold expected the TACT officers to read that document and generally understand its substance – but concedes he does not know whether the TACT officers had any

4

medical knowledge. (Dkt. 110 ¶ 9). In any case, the document Saffold presented to the officers did not ban the use of handcuffs on him, (*Id.* ¶ 11); nor did it require Saffold to be restrained with waist chains instead of handcuffs. (*Id.* ¶ 70). The document did not mention handcuffs or waist restraints whatsoever. (*Id.* ¶ 11).

TACT officers handcuffed Saffold behind his back and escorted him to the prison facility's dining room. (*Id.* ¶ 15; Dkt. 122 ¶ 8). Saffold experienced severe pain while handcuffed in this position. (Dkt. 122 ¶ 8). Saffold claims that Defendant Medin was, for a time, the only officer present in the dining room when TACT officers brought inmates there during the shakedown. (Dkt. 94-2 at 158:7–159:5). Saffold pled with Defendant Medin to remove his handcuffs or call for medical assistance. (Dkt. 122 ¶ 8; *see also* Dkt. 94-2 at 158:18–159:2, 159:19–160:10). Defendant Medin allegedly denied these requests initially. (Dkt. 94-2 at 158:22–23, 159:22–160:10). Saffold asserts that he then told "[e]verybody who was walking past" the dining room that he required medical attention, including Defendants Artl and Pfister. (Dkt. 94-2 at 158:24–159:7; *see also* Dkt. 110 ¶ 16). A nurse eventually came to the dining room to provide medical treatment to Saffold, although it took approximately two hours for her arrive. (Dkt. 110 ¶ 17; Dkt. 122 ¶ 8). When the nurse arrived, she had Saffold's handcuffs removed. (Dkt. 122 ¶ 8). The record is absent as to what other treatment, if any, the nurse provided. The nurse departed approximately seven minutes later, and Saffold was again handcuffed behind his back the TACT team. (Dkt. 122 ¶ 8; *see also* Dkt. 94-2 at 160:22–161:7 (Saffold stating that he was re-handcuffed by "[o]ne of them Orange Crush[1] dudes")). Saffold estimates that he was handcuffed after the nurse's visit for approximately one to two hours. (Dkt. 122 ¶ 8; *see also* Dkt. 113 at 4, 10). Ultimately, Saffold was handcuffed in this manner for a total of about 3.5 to 4 hours. (Dkt. 122 ¶

---

[1] The TACT team is colloquially known as "Orange Crush." (Dkt. 113 at 3).

8).  He initiated a grievance process concerning the shakedown later that same day – as detailed further below.  (*Id.* ¶ 21).

D.    **Saffold's Grievances**

IDOC inmates can protest prison conditions and unfair treatment by filing grievances with their facility.  (Dkt. 110 ¶ 20).  All Stateville inmates are made aware of the grievance procedures though an orientation manual and an oral presentation.  (*Id.* ¶¶ 39–40).  Saffold admits that he is familiar with IDOC's grievance process.  (*Id.* ¶ 43).

IDOC has a formal grievance procedure for inmates to file *non-emergency* complaints.  (*Id.* ¶¶ 20–21; *see also* Dkt. 94-1).  First, an inmate must attempt to informally resolve any issue through his counselor.  (Dkt. 110 ¶ 22).  Second, if the grievance remains unresolved, he may file a written grievance within sixty days of the grieved event.  (*Id.* ¶ 23).  The grievance filed must contain factual details regarding each aspect of the inmate's complaint – including the "who, what, when, why and where" of the occurrence at issue.  (Dkt. 94-1 ¶ 4).  Prison employees serving as Grievance Officers investigate these written grievances and issue a report containing their factual findings, conclusions, and recommendations for relief as applicable.  (Dkt. 110 ¶¶ 25–26).  The written grievance and Grievance Officer's Report are then forwarded to the prison facility's Chief Administrative Officer ("CAO" or "Warden") for final review and signature.  (*Id.* ¶ 27).  The Grievance Officer's Report with the CAO's final decision is then submitted back to the inmate. (*Id.* ¶ 28).  Third, the inmate may appeal in writing to the Director of the Department by submitting the Grievance Officer's report and CAO's decision.  (*Id.* ¶ 29).  The Administrative Review Board ("ARB"), as the Director's designee, reviews the appeal and determines whether the inmate's grievance can be handled without the necessity of a hearing.  (*Id.* ¶ 30).  Other matters are scheduled for an ARB hearing involving an interview of the grieving inmate, examining relevant

documents, and calling witnesses as needed. (*Id.* ¶ 31). The ARB compiles a written report of its findings and recommendations for the facility Director, who makes a final determination on the grievance. (*Id.* ¶ 31).

An inmate may alternatively request a grievance be handled on an "emergency" basis by forwarding his grievance directly to the CAO, rather than to a counselor or Grievance Officer. (*Id.* ¶ 33). If the CAO determines that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the inmate, the grievance will be treated as an emergency. (*Id.* ¶ 34). If the CAO determines that "an emergency is not substantiated," the grievance is returned to the inmate with instructions that he "should submit the grievance in the normal manner." (Dkt. 94-1 ¶ 7). An inmate may appeal the CAO's decision in such a situation to the ARB. (Dkt. 110 ¶ 36). The appeal is then handled in accordance with the standard ARB procedures described above. (*Id.*). Saffold submitted two grievances in response to the July 12, 2016 shakedown. (Dkt. 122 ¶ 21).

### 1.     Saffold's July 12 Grievance

Saffold filed a regular grievance dated July 12, 2016 concerning the TACT shakedown (the "July 12 Grievance"). (Dkt. 94-1 at 12). Therein, Saffold explained that he suffers from various chronic illnesses and opined that he could not be handcuffed behind his back safely. (Dkt. 94-1 at 12–13; Dkt. 110 ¶ 49). Saffold conceded in the July 12 Grievance that he did not have a "permit" – presumably referencing a permit for medical restraints – but claimed that he should have had one given his medical conditions. (Dkt. 94-1 at 13). Saffold set forth that TACT handcuffed him behind his back during the shakedown, leaving him numb from his shoulders down to his fingertips after fifteen minutes. (*Id.*). TACT nonetheless refused to readjust Saffold's handcuffs or call for medical assistance. (*Id.*). After an hour, Saffold's shoulder ached, his hands swelled, and blood

could not reach his fingers. (*Id.*). He also felt dizzy and "[saw] spots." (*Id.*). Despite this, Defendant Medin[2] initially refused to call for medical intervention on Saffold's behalf. (*Id.*). After "well over an hour," a nurse arrived to see Saffold. (*Id.*). Ultimately, TACT handcuffed Saffold behind his back for over three hours in total. (*Id.*). Saffold's hands felt swollen and numb, his blood pressure rose, and he had "severe pain" in his shoulders. (*Id.*). Saffold concluded the July 12 Grievance stating that "[t]hrough and including the time of this writing my fingers still have not regained the full blood flow without numbness and tingling, the cuff mark[s] are still on my wrist, I am in pain. . . . I have bruises on my wrist and I [feel] swelling and numbness in my hands and fingers." (*Id.*). He rated his pain an 8 or 9 on a scale of 1–10. (*Id.*). Saffold's requested relief included treatment of his injuries, a permit for medical restraints, compensation for pain and suffering, and termination of Medin's employment. (*Id.* at 12).

Saffold failed to explicitly identify the date of the shakedown in his July 12 Grievance. (Dkt. 110 ¶ 50 (Saffold disputing this fact to the extent that he dated the grievance form itself July 12, 2016 but failing to adduce evidence that the grievance explicitly stated the date of the grieved event)).[3] But this did not prevent certain Stateville staff from investigating and addressing the July 12 Grievance on its merits. (Dkt. 122 ¶ 21). For example, Saffold received a Counselor's Response to his July 12 Grievance on August 4, 2016. (Dkt. 94-1 at 12). Although Defendant Artl was not named in the July 12 Grievance, (Dkt. 110 ¶ 50), Saffold's Counselor nonetheless deduced he must consult Artl about the grieved event while drafting the Response. (Dkt. 94-1 at 12 (citing Artl as stating that "medical was present for any issues and restraints were adjusted in

---

[2] The July 12 Grievance does not specifically identify Defendants Artl or Pfister, nor any other IDOC officer or employee. (Dkt. 110 ¶¶ 55–56). Saffold admits that he learned of Defendant Artl's "identity and involvement in" the shakedown" after filing his grievances, but never filed a grievance naming Artl. (*Id.* ¶ 55). Saffold also concedes he was aware of Defendant Pfister's presence at the shakedown despite failing to name him in the grievance. (*Id.* ¶ 56).
[3] *See also* Dkt. 94-2 at 19:2–23 (Saffold testifying to his belief that by appropriately dating his grievance which concerned an incident from earlier in the same day, he provided adequate notice as to the relevant date).

the Dining room as needed")).  Further, the Counselor indicated that Saffold was seen for pain in his right shoulder on July 29, 2016.  (*Id.*).  The Counselor did not mention that Saffold's July 12 Grievance failed to articulate the date of the shakedown.  (*Id.*).

A Grievance Officer next issued a Report on October 20, 2016 denying the July 12 Grievance on its merits.  (*Id.* at 11).  The Report flagged that Saffold's July 12 Grievance did not specify the date of his alleged injury – but this was *not* the basis of the Grievance Officer's decision.  (*Id.* at 11).  The Grievance Officer denied Saffold's July 12 Grievance because, "[b]ased upon a total review of all available information," there was "no substantiation that staff acted improperly; [Saffold] was seen by medical staff."  (*Id.* at 11).  The CAO summarily concurred with the Grievance Officer's Report on October 21, 2016.  (*Id.* at 11).  Saffold appealed the CAO's Response to the ARB on October 23, 2016.  (*Id.* at 11; Dkt. 110 ¶ 51).

On November 10, 2016, ARB Chairperson Benton denied Saffold's July 12 Grievance appeal.  (Dkt. 94-1 at 10).  The ARB grounded its decision on the fact that Saffold failed to meet procedural requirements of the Administrative Code – namely, because he (1) failed to provide a date for the shakedown, and (2) "only provided a date of 5/15/16[,] a date well outside of the 60 day limitations period for grievance appeals."  (Dkt. 110 ¶ 52).  Benton was the first Stateville official to reject Saffold's grievance on procedural grounds.

### 2.    Saffold's Emergency Grievance

On July 13, 2016, Saffold filed a second grievance concerning the shakedown, this time on an emergency basis (the "Emergency Grievance").  (Dkt. 94-1 at 8).  Unlike in his July 12 Grievance, Saffold explicitly mentioned the date of the event in his Emergency Grievance.  (*Id.*).  The Emergency Grievance is otherwise substantively similar to the July 12 Grievance.  Saffold again surveyed his medical conditions and recounted mistreatment by the "tactical team and the

[correctional officer] running it[, correctional officer] Medin[]."[4] (*Id.* at 8–9). As in his July 12 Grievance, Saffold noted that his hands were forced behind his back for over three hours and that Defendant Medin "[i]gnored [Saffold's] health ailments for [two hours]." (*Id.*). He experienced numbness, swelling, and tingling from his shoulders down to his fingertips as a result of this treatment and rated his pain an 8 or 9 on a scale of 1–10. (*Id.*). Saffold reiterated that Nurse Paige eventually attended to him, adding that Paige asked Defendant Medin to place Saffold's arms in a less hurtful position. (*Id.*). Saffold introduced new details about being denied restroom use, deprived of water, and forced to painfully sit down with his hands behind his back. (*Id.* at 8). He opined that he should have had a medical restraint permit and that Medin should have called for a nurse sooner. (*Id.* at 9). And just as in his July 12 Grievance, Saffold's requested relief included treatment of his injuries, a permit for medical restraints, compensation for pain and suppering, and termination of Defendant Medin's employment. (*Id.* at 8).

On July 26, 2016, Defendant Pfister summarily denied Saffold's Emergency Grievance as "emergency not substantiated." (Dkt. 110 ¶ 57; Dkt. 122 ¶ 21). Saffold appealed this finding to the ARB. (Dkt. 110 ¶ 57). ARB Chairperson Benton – the same official who would later decide Saffold's July 12 Grievance – handled the Emergency Grievance.[5] (Dkt. 94-1 at 7, 10). On August 30, 2016, Benton denied Plaintiff's Emergency Grievance appeal for lacking sufficient documentation. (Dkt. 110 ¶ 58; Dkt. 122 ¶ 21). Benton instructed Plaintiff to provide the ARB a copy of his original grievance along with the Grievance Officer and CAO's responses – essentially admonishing Saffold to resubmit the emergency grievance and await a response from the facility.

---

[4] The Emergency Grievance does not specifically identify Defendants Artl or Pfister, nor any other IDOC officer or employee. (Dkt. 110 ¶¶ 55–56).

[5] Given the nature of emergency grievance procedures, Saffold's Emergency Grievance reached the ARB several months before his July 12 Grievance. (*Compare* Dkt. 94-1 at 7 (indicating the ARB returned the Emergency Grievance on August 30, 2016), *with id.* at 10 (showing the ARB returned the July 12 Grievance on November 10, 2016)).

(Dkt. 110 ¶ 58). On the date Saffold's Emergency Grievance was denied, Saffold's July 12 Grievance was still pending in Stateville's standard procedures. (Dkt. 94-1 at 11–12 (showing the Grievance Officer's Report and CAO Response addressing the July 12 Grievance were dated October 2016, and same regarding the ARB denial dated November 2016)).

### 3. Summary of Key Events

The table below summarizes key events in Saffold's July 12 Grievance and Emergency Grievance filings – from their date of submission to denial by the ARB.

| Event # | Date | Grievance | Description |
|---------|------|-----------|-------------|
| 1 | July 12, 2016 | July 12 | Saffold files July 12 Grievance, (Dkt. 94-1 at 12–13). |
| 2 | July 13, 2016 | Emergency | Saffold files Emergency Grievance, (*id.* at 8). |
| 3 | July 25, 2016 | Emergency | CAO determines Emergency Grievance is not substantiated, (*id.* at 8). |
| 4 | Aug. 4, 2016 | July 12 | Counselor substantively responds to July 12 Grievance, (*id.* at 12). |
| 5 | Aug. 12, 2016 | Emergency | Saffold appeals CAO's non-emergency finding to ARB, (*id.* at 7). |
| 6 | Aug. 30, 2016 | Emergency | ARB (via Benton) issues Return of Grievance, (*id.* at 7). |
| 7 | Oct. 20, 2016 | July 12 | Grievance Officer substantively responds to July 12 Grievance, (*id.* at 11). |
| 8 | Oct. 21, 2016 | July 12 | CAO issues response to July 12 Grievance, (*id.* at 11). |
| 9 | Nov. 2, 2016 | July 12 | Saffold timely appeals to ARB, (*id.* at 10). |
| 10 | Nov. 10, 2016 | July 12 | ARB (via Benton) issues Return of Grievance because "no date of incident [was] provided," (*id.* at 10). |
| 11 | Dec. 21, 2018 | – | Saffold files First Amended Complaint, (Dkt. 26). |

### E. Saffold's Medical Condition After the Shakedown

In the days following the shakedown, Saffold continued to experience pain in his shoulders and wrists. (Dkt. 122 ¶¶ 9–10). On July 19, 2016, IDOC medical staff noted tenderness in his shoulders and wrists, and referred him to be seen again on July 21, 2016. (*Id.*). On that date, the

treating physician's assistant noted abrasions on Saffold's wrists, swelling in his right wrist, acute strain in his right shoulder, and acute wrist pain. (*Id.* ¶ 10). Saffold later saw Dr. Volkov on September 19, 2016, his first visit with her since the shakedown. (*Id.* ¶ 11). Saffold told Dr. Volkov that he had been handcuffed for over four hours and, since then, had intermittent numbness in his fingertips. (Dkt. 110 ¶ 77). Dr. Volkov observed that Saffold's "range of motion had significantly decreased especially on the left side, and his abduction, which was 60 degrees in December of 2015 is now 45 degrees." (Dkt. 122 ¶ 11). Dr. Volkov also diagnosed Saffold with carpal tunnel syndrome for the first time during this visit. (*Id.*). On September 20, 2016, Dr. Obaisi issued Saffold wrist brace permits for one year upon Dr. Volkov's recommendation. (*Id.* ¶ 12). During Saffold's next visit with Dr. Volkov, on April 3, 2017, Saffold's left shoulder abduction was still 45 degrees. (*Id.* ¶ 13). Dr. Volkov therefore ordered an MRI to evaluate Saffold's shoulder for a tear. (*Id.*). Saffold ultimately had a CT scan of his left shoulder on April 23, 2018, after his doctors determined an MRI would be unsafe for him. (Dkt. 111 ¶¶ 55, 60).

Eighteen months later, on December 4, 2018, Dr. Marlene Henze ("Henze") saw Saffold for a medical evaluation and noted that he had a tear in his left shoulder. (Dkt. 122 ¶ 17; Dkt. 111 ¶ 66). Dr. Henze reached this conclusion because she "could not rule out a partial thickness tear" based on Saffold's CT scan, and Saffold "presented with decreased range of motion in his shoulders, and more specifically, there was tenderness anteriorly and decreased external rotation," presumably all consistent with the presence of a tear. (Dkt. 122 ¶ 17). In the months that followed, Saffold continued to report a limited range of motion in his shoulders and shoulder pain "which was exacerbated by any type of movement." (Dkt. 111 ¶¶ 68–69). Nearly three years after the incident, on May 13, 2019, UIC's Dr. Benjamin Goldberg ("Goldberg") determined that Saffold likely had a rotator cuff tear and proposed that Saffold undergo a shoulder replacement surgery.

(*Id.* ¶ 69).  Saffold agreed and saw Dr. Goldberg on December 2, 2019 for the surgery.  (*Id.* ¶ 71; Dkt. 122 ¶ 18).  The pre- and post-operative diagnosis for the shoulder replacement surgery was left shoulder end-stage arthritis, and the operative report does not indicate that the surgery was necessitated by anything other than Plaintiff's degenerative shoulder condition.  (Dkt. 111 ¶ 71).  Further, although Dr. Goldberg a suspected a rotator cuff tear prior to surgery, no tear was noted in the operative report after an actual visual examination of Plaintiff's shoulder tissues.  (*Id.* ¶ 72).

## **LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019).  Summary judgment "requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial."  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).  In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**DISCUSSION**

**A.      Administrative Exhaustion**

The PLRA states: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This requirement is mandatory, and "a court may not excuse a failure to exhaust." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). "Grievances are intended to '[allow prisons] to address [issues] before being subjected to suit, [reduce] litigation to the extent complaints are satisfactorily resolved, and [improve] litigation that does occur by leading to the preparation of a useful record.' " *Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011) (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)). *See also Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2013) ("The exhaustion requirement's primary purpose is to alert [] the state to the problem and invite corrective action.") (internal citation and quotation marks omitted).

To exhaust administrative remedies, an inmate must use " 'all steps that the agency holds out,' and he must 'do[ ] so properly (so that the agency addresses the issues on the merits).' " *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)); *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016). Because Saffold is housed in an IDOC facility, he must abide by the grievance process established by Illinois law, codified in 20 Ill. Admin. Code §§ 504.800 *et seq.* Among other things, the Code requires grievances to "contain factual details regarding each aspect of the [inmate's] complaint, including what happened, when, where and the name of each person who is the subject of or who is otherwise involved in the complaint." *Id.* § 504.810(c). An inmate may file a grievance even when he does not know the identities of those involved in the complaint, but he then "must include as much

descriptive information about the individual[s] as possible." *Id.* Strict adherence to the exhaustion requirements is required. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). However, "[p]rison officials may not take unfair advantage of the exhaustion requirement . . . and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Id.* To be available as an administrative remedy, the remedy must "be available in fact and not merely in form." *Schultz v. Pugh*, 728 F.3d 619, 620 (7th Cir. 2013); *accord Ross v. Blake*, 136 S.Ct. 1850, 1858–60 (2016). While exhaustion requirements are strict, failure to exhaust is an affirmative defense and the IDOC Defendants maintain the burden of proof of showing that Saffold failed to exhaust his grievances. *See Westefer v. Snyder*, 422 F.3d 570, 577 (7th Cir. 2005). Courts analyze a prisoner's exhaustion under the preponderance of the evidence standard. *See, e.g.*, *Hebron v. Baldwin*, No. 17-cv-6254, 2020 WL 757900, at *1 (N.D. Ill. Feb. 14, 2020) (citing *Jones v. Dart*, No. 14-cv-1929, 2016 WL 1555588, at *2 (N.D. Ill. Apr. 18, 2016) (collecting cases)).

IDOC Defendants argue that Saffold failed to exhaust his administrative remedies prior to filing suit because his two grievances suffered from various procedural defects. Specifically, they assert: (1) neither of Saffold's grievances implicate defendants Artl or Pfister; (2) the July 12 Grievance failed to provide any date for the incident; and (3) Saffold failed to follow the proper procedures for resubmitting his Emergency Grievance prior to his appeal. The Court addresses each of these purported deficiencies in turn.

### 1. Saffold's July 12 Grievance

The IDOC Defendants contend that the July 12 Grievance provides insufficient facts to "give prison officials a fair opportunity to address" his issue. (Dkt. 123 at 1). This is premised in part on its alleged failure to implicate Defendants Artl or Pfister. (*Id.* at 2). However, the PLRA

does not categorically require an inmate to name prospective defendants in his grievance – even if the prospective defendants were known to him when the grievance was written. *See, e.g.*, *Donald v. Varga*, No. 17-cv-50368, 2019 WL 2525856, at *5 (N.D. Ill. June 19, 2019) (citation omitted) (internal citations and quotation marks omitted).  Courts have elaborated that "the purpose of [§ 504.810(c)] is to put prison officials on notice of an issue at the prison; failure to include named defendants in a grievance is 'a mere technical defect' where the inmate sufficiently describes the alleged wrongdoing to allow prison officials a fair opportunity to respond." *Id.* (citing *Kyles v. Beaugard*, No. 15-cv-8895, 2017 WL 4122708, at *8 (N.D. Ill. Sept. 18, 2017) (*quoting Maddox*, 655 F.3d at 722)).  Put another way, Saffold need not have named Defendants Artl and Pfister in his grievance so long as his grievance sufficiently "raise[d] the issue which is the subject of the lawsuit." *Id.* (citing *Maddox*, 655 F.3d at 722).

Here, the July 12 Grievance plainly referred to events that took place during a particular Stateville shakedown.  Saffold also maintains that "everybody in the institution knows what day that the [TACT team] came down here. . . . It's impossible for them not to work at the institution and not realize when they came down." (Dkt. 94-2 at 20:21–21:2).  Furthermore, Saffold conveyed the specific date of the shakedown via his Emergency Grievance.  Cumulatively, the information provided by Saffold was sufficient to put Stateville officials on notice of the grieved-of issues and allow Stateville to identify the employees involved in the shakedown.  As such, Saffold's failure to name Defendants Artl and Pfister, who all agree were present during the shakedown, (Dkt. 110 ¶¶ 55–56), amounts to a "mere technical defect" not dispositive of the exhaustion issue. *See, e.g.*, *Donald*, 2019 WL 2525856, at *5; *see also Span v. Chavez*, No. 15-cv-50063, 2018 WL 6046144, at *2 (N.D. Ill. Nov. 19, 2018); *Kyles v. Beaugard*, 2017 WL 4122708, at *8.

Defendants cite *Roberts v. Neal* to support their argument that failing to implicate a defendant amounts to a "fatal defect" in the grievance. (Dkt. 123 at 2); 745 F.3d 232 (7th Cir. 2014). In *Roberts*, however, the "fatal defect" was that the grievance neither identified the defendant by name *nor* "provided information that should have identified [the defendant] to the grievance officer." *Roberts*, 745 F.3d at 234. By contrast, Saffold failed to name Defendant Artl in his July 12 Grievance, yet still provided enough information to identify him to prison officials. This is evidenced by the fact that the Counselor knew to interview Defendant Artl about the July 12 Grievance – despite his not being named – and the Grievance Officer subsequently adopted the Counselor's findings and addressed the July 12 Grievance on its merits. (Dkt. 94-1 at 11, 12). *Roberts* therefore does not preclude Saffold's claim from proceeding. Nor does the IDOC Defendants' citation to *Ambrose v. Godinez*, 510 Fed. App'x 470 (7th Cir. 2013), which upheld summary judgment where "no grievance mention[ed certain defendants] by name *or inference*." *Id.* at 472 (emphasis added). Here, Saffold provided a detailed account of the shakedown – including the date it occurred, as discussed below – sufficient to allow prison officials to deduce which individuals were present at and involved with the shakedown.

IDOC Defendants next argue that the July 12 Grievance fails because it omits the specific date of the July 12 TACT shakedown. (Dkt. 123 at 3). They argue that without a date clearly specified in the July 12 Grievance, "[o]fficials were not put on notice of [Saffold's] complaint," and he therefore never properly exhausted available administrative remedies. (*Id.*; *see also* Dkt. 94-1 at 10 (indicating the ARB denied Saffold's July 12 Grievance appeal because he did not provide a date of incident[6])). The IDOC Defendants conclude that given the lack of a date, Saffold

---

[6] In the ARB's denial of Saffold's July 12 Grievance, it also noted that the only date Saffold mentioned therein was May 15, 2016. (Dkt. 94-1 at 10). The ARB briefly explained that May 15, 2016 "refers to assessment by med[ical] staff," not the shakedown, and "is also over [the] 60-day[] time limit for filing a grievance. (*Id.*). The ARB's point here is moot from the outset since there is no indication that Saffold intended to stake any claim on the May 15, 2016

17

"never provided the ARB with a _full record_ sufficient to determine any appeal of his grievances related to the 7/12/2016 TACT shakedown."  (Dkt. 110 ¶ 59 (emphasis added)).

It is true that the July 12 Grievance did not specifically note the date of the shakedown and that the ARB partly denied his appeal on that ground.  (Dkt. 94-1 at 10, 12–13).  But Saffold filed a second grievance, the Emergency Grievance, which _did_ specify the operative date.  (_Id._ at 8 ("On 7-12-2016 I was subjected to cruel and unusual punishment.")).  Aside from that distinction, Saffold's two grievances are complete.  At the top of each grievance form, in the "Nature of Grievance" section, Saffold marked boxes indicating that the complaints related to "Staff Conduct" and "Orange Crush."  (_Id._ at 8, 12).  Both grievances describe medical issues with Saffold's rotator cuff and his "frozen shoulder" condition.  (_Id._ at 9, 12–13).  They similarly detail an event where Saffold was handcuffed behind his back for several hours and experienced numbness, swelling, and tingling from his shoulders to his fingertips.  (_Id._ at 8–9, 13).  The grievances also reflect that Saffold rated his pain during this event an 8 or 9 on a scale of 1 to 10.  (_Id._ at 8, 13).  They both note that Nurse Paige intervened to provide medical assistance.  (_Id._ at 9, 12–13).  Finally, Saffold requested the same relief in both of his grievances: namely, medical treatment and restraints, compensation, and termination of Defendant Medin's employment.  (_Id._ at 8, 12).  Even a cursory review of his grievance documents – filed one day apart, no less – indicates that they pertain to the same event – an event that was evident to staff because of its nature – a facility-wide shakedown.

Saffold also appealed both of his grievances to the ARB.  Although it was last to be filed, Saffold's Emergency Grievance was the first to cross the ARB's desk.  ARB Chairperson Benton denied the Emergency Grievance in August 2016.  (_Id._ at 7).  Benton herself explained that the ARB maintains copies of all inmate grievances submitted to the ARB, and that she regularly

---

date.  But if he did, it was not outside of the 60-day time limit for filing a grievance; the July 12 Grievance was filed only 58 days after May 15, 2016 and therefore would not have been time-barred.

accesses those files. (*Id.* ¶ 9). Therefore, when Benton denied the July 12 Grievance in November 2016 (several months later), she had access to and personal knowledge of Saffold's Emergency Grievance – which, again, plainly relates to the same event as the July 12 Grievance *and* sets forth the date of the shakedown.

Given all the information the ARB had before it, IDOC Defendants' claim that Saffold "never provided the ARB with a full record," (Dkt. 110 ¶ 59), simply belies reason. Saffold alerted IDOC to his problem by filing separate complaints about the July 12 shakedown. *See e.g.*, *Bandala-Martinez v. Bebout*, 188 F.Supp.3d 836, 843 (S.D. Ill. 2016) (accepting that inmates may file supplemental documents to support and essentially remedy defective grievances, and that prison facilities must consider such supplemental documentation when assessing an inmate's claims). His July 12 Grievance contained detailed allegations about the shakedown and the Emergency Grievance clearly stated when the shakedown occurred (if there was any genuine question about that fact to begin with). The state prison system cannot plead an exhaustion defense by turning a blind eye to key evidence produced by an aggrieved inmate. *See, e.g.*, *Maddox*, 655 F.3d at 720–21 (reversing grant of summary judgment in favor of Defendant where it "belie[d] reason" to suggest that prison officials were unaware of a key fact merely because of a minor procedural defect); *Dole*, 438 F.3d at 809 ("Prison officials may not take unfair advantage of the exhaustion requirement."). The State's exhaustion affirmative defense is thus denied on this ground as well.

IDOC Defendants set forth other minor arguments assailing Saffold's failure to specify a date in his July 12 Grievance, each of which is unavailing. One of them is worth brief mention, however. IDOC Defendants allege that when the Grievance Officer denied the July 12 Grievance, the Grievance Officer wrote "that [Saffold] failed to include the specific date of the incident."

(Dkt. 123 at 3).  Yet, "[r]ather than correct th[is] deficiency, [Saffold] sent the grievance to the ARB to try and superficially exhaust his administrative remedies."  (*Id.*).  Yet, Saffold's July 12 Grievance was addressed *on its merits* at every stage of review – including the Grievance Officer's denial on October 20, 2016 – until the ARB denied it on procedural grounds.  Although the Grievance Officer cursorily mentioned that the July 12 Grievance did not clearly specify when the shakedown occurred, he nonetheless substantively denied it "due to [there being] no substantiation that staff acted improperly."  (Dkt. 94-1 at 11).  The Grievance Officer did not cite the omission of a date as his reason for denying the grievance, and thus Saffold did not appeal to the ARB to "superficially exhaust his administrative remedies."  Rather, he appropriately appealed to the ARB in accordance with Stateville's grievance procedures.

### 2.    Saffold's Emergency Grievance

Because the July 12 Grievance was exhausted, and because the allegations therein are substantively identical to those in the Emergency Grievance, the question of whether the Emergency Grievance may also proceed is moot.  However, the Court will briefly address the Emergency Grievance for the sake of completeness.

The IDOC Defendants again argue they are entitled to summary judgment as to the Emergency Grievance because Saffold did not implicate Defendants Artl and Pfister therein.  For the same reasons set forth above, the Court declines to grant summary judgment on this ground. *See, e.g.*, *Donald v. Varga*, 2019 WL 2525856, at *5 ("[F]ailure to include named defendants in a grievance is 'a mere technical defect' where the inmate sufficiently describes the alleged wrongdoing to allow prison officials a fair opportunity to respond."); *Span v. Chavez*, 2018 WL 6046144, at *2; *Kyles v. Beaugard*, 2017 WL 4122708, at *8.

20

Finally, IDOC Defendants maintain that the Emergency Grievance was not exhausted at the administrative level because Saffold did not file it in accordance with Stateville's grievance protocols. (Dkt. 95 at 7). On two occasions, IDOC officials determined that the Emergency Grievance did not rise to the level of an emergency and directed Saffold to resubmit it in the "normal manner." (Dkt. 110 ¶¶ 57, 58 ("The ARB . . . essentially[] admonish[ed] Plaintiff to resubmit the emergency grievance and await a response from the facility.")). Saffold never refiled his Emergency Grievance in the normal manner – perhaps because when the ARB denied his Emergency Grievance appeal, his July 12 Grievance was still pending. The Court therefore grants IDOC Defendants' motion for summary judgment as to the Emergency Grievance because Saffold did not comply with the facility's express order to refile his grievance with supplemental information. *See, e.g.*, *Edens v. O'Brien*, No. 14-cv-50056, 2016 WL 4191756, at *9–12 (granting summary judgment for IDOC where "plaintiff overtly disregarded the agency's procedures by failing to respond to the ARB's explicit instructions" to provide additional information, and collecting cases).

**B.    Saffold's Deliberate Indifference Claims**

In order to prevail on an Eighth Amendment claim for deliberate indifference to serious medical needs, an inmate must demonstrate (1) an objectively serious medical condition and (2) an official's deliberate indifference to a risk of serious harm stemming from that condition. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A serious medical condition is "one that a physician has diagnosed as needing treatment or 'one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (quoting *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006)). Deliberate indifference is a mental element that requires "more than negligence or gross negligence, but less than

purposeful infliction of harm." *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003); *see also Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (noting a prison official is deliberately indifferent when he acts or fails to act "despite his knowledge of a substantial risk of serious harm" to the inmate); *Proffitt v. Ridgway*, 279 F.3d 503, 506 (7th Cir. 2002) (deliberate indifference to a prisoner's safety implies avoidance of a known risk, not merely a foreseeable one). Additionally, a defendant can be held liable under § 1983 only if he was personally involved in the conduct that led to a deprivation of constitutional rights. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). In short, the deliberate indifference standard requires that the defendant knew about the conduct that deprived the plaintiff of his rights, condoned that conduct, facilitated it, approved of it, or turned a blind eye to it. *Arnett*, 658 F.3d at 757.

As to the first element, Obaisi and the IDOC Defendants do not dispute that Plaintiff's shoulder condition was serious. Therefore, the question is whether a rational juror could find, on the evidence in this record, that the Defendants were deliberately indifferent to Saffold's medical needs.

### 1. Dr. Obaisi

Prisoners are entitled to adequate medical care. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). They are not entitled, however, to "unqualified access to care." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). A medical professional will only be held liable under the deliberate indifference standard if she makes a decision that is "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). *See also Burton v. Downey*, 805 F.3d 776, 785 (7th

Cir. 2015); *King v. Kramer*, 680 F.3d 1013, 1018–19 (7th Cir. 2012). Disagreement between a prisoner and his doctor about the proper course of treatment is generally insufficient to establish an Eighth Amendment violation. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Courts review the totality of an inmate's medical care when considering whether that care evinces deliberate indifference to serious medical needs. *See Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019); *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016); *DeBoer v. Luy*, 70 Fed. App'x 880, 882 (7th Cir. 2003); *Dunigan* ex rel. *Nyman v. Winnebago Cty.*, 165 F.3d 587, 591 (7th Cir. 1999); *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997).

Plaintiff contends that "this is a case of a doctor with the sole ability to properly treat [his] serious medical conditions, but choosing not to, leading to Plaintiff's serious injury." (Dkt. 113 at 10). He alleges that Dr. Obaisi was deliberately indifferent when he "chose, with no appropriate medical reason, not to provide Plaintiff with . . . a waist chain permit," leaving Saffold susceptible to injury. (*Id.* at 9; *see also* Dkt. 111 ¶ 73 (arguing that "waist chain permits would have prevented [Plaintiff's shoulder] injury")). Saffold effectively asks the Court to ignore the bulk of Dr. Obaisi's yearslong record of treatment – and to focus exclusively on the fact that Saffold lacked an active waist chain permit in July of 2016.

But the Court's review of the facts is not so limited. In assessing whether Dr. Obaisi acted with deliberate indifference, we must examine the *totality* of an inmate's medical care. *E.g.*, *Lockett*, 937 F.3d at 1023. The totality of Dr. Obaisi's care demonstrates that he was "continually solicitous of" and "responsive to" Plaintiff's medical needs. *Dunigan*, 165 F.3d at 592. From the outset, the undisputed facts reflect that Dr. Obaisi was responsive to Saffold's medical needs leading up to and following the shakedown. (Dkt. 111 ¶¶ 14–72). For example, from 2012 to

23

2018, Dr. Obaisi annually issued Saffold low bunk and low gallery permits so that Saffold would not have to climb to an elevated bed or upstairs to get to his cell. (*Id.* ¶¶ 12, 14, 16, 29, 29, 36, 42, 50, 54, 59). Obaisi similarly granted permits for Saffold to wear gloves given Saffold's Raynaud's disease and sensitivity to cold temperatures. (*Id.* ¶¶ 14, 16, 20, 29, 36 (indicating seven occasions that Dr. Obaisi issued glove permits)). Dr. Obaisi moreover issued bilateral wrist brace permits from 2016 to 2018 to address Saffold's carpal tunnel syndrome. (*Id.* ¶¶ 42, 50, 54, 59). Obaisi provided Saffold still other permits for medical showers in 2014 and 2016, (*id.* ¶¶ 19, 20, 36), as well as for extra toilet paper in 2014 and 2017, (*id.* ¶¶ 20, 54).

The record further reflects that Dr. Obaisi oversaw an effective treatment plan for Saffold's conditions. (*Id.* ¶¶ 14–72). Saffold recognizes, for example, that Dr. Obaisi was in "communication repeatedly with UIC about Plaintiff's treatment." (Dkt. 113 at 8). Dr. Obaisi consistently followed the recommendations of Dr. Volkov – Saffold's rheumatologist – and referred Saffold for physical therapy and follow-up appointments with specialists. (Dkt. 111 ¶¶ 8, 74). Indeed, Dr. Obaisi referred Saffold to UIC's Rheumatology Clinic on at least eleven occasions between 2013 and 2018. (*Id.* ¶¶ 15, 20, 22, 24, 30, 31, 34, 42, 47, 52, 56; *see also id.* ¶¶ 10–11 (adding that Plaintiff had seen a rheumatologist since 2010)). Dr. Obaisi helped Saffold secure no fewer than sixteen visits with treating rheumatologists in the same timeframe. (*Id.* ¶¶ 18, 21, 23, 25, 28, 30, 31, 33, 34, 40, 46, 48, 55, 61, 65, 68). Physicians at the Rheumatology Clinic prescribed medications to Saffold and monitored his physical condition, (*e.g.*, *id.* ¶ 23), and their specialized care appeared to improve Saffold's health, (*e.g.*, *id.* ¶¶ 28 (reporting rheumatologist's prescriptions "significantly helped" Plaintiff's pain), 30 (indicating Plaintiff's symptoms "were under good control" and pain was "improved"), 33 (same)). Dr. Obaisi also partook in several collegial review conferences with other doctors to develop appropriate plans of care for Saffold. (*Id.* ¶¶ 15, 47,

24

57).  This record does not allow for a reasonable jury to infer that Dr. Obaisi acted with deliberate indifference.

Still, Saffold makes much of the fact that Dr. Obaisi twice issued him waist chain permits in the years leading up to the shakedown.  (Dkt. 113 at 8).  He posits that "Dr. Obaisi *ceased issuing* Plaintiff waist chain permits that would have prevented [his] injury . . . [and] reduce[d] the risk of further damage to [Plaintiff's] shoulders."  (Dkt. 111 ¶ 73 (emphasis added)).  But even if a waist chain could have theoretically prevented Saffold's claimed injuries, the facts still fail to evince a culpable state of mind on Dr. Obaisi's part considering the totality of his care, described above.  *Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 50 (2019) (holding that a "concerning oversight" did not amount to a "knowing disregard of an excessive risk to [inmate's] health and safety" where medical treatment was otherwise adequate); *Dunigan*, 165 F.3d at 591 ("[A]lthough the defendants' treatment of [plaintiff] . . . fell short [in some respects], there was no clear indication of lack of concern [in the totality]."); *Gutierrez*, 111 F.3d at 1375 (explaining that "isolated instances of neglect" do not evidence deliberate indifference when medical care is otherwise sufficient).  *See also Burton*, 805 F.3d at 785 (7th Cir. 2015) ("Negligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is not enough [to state a deliberate indifference claim].") (citation omitted).

Such framing of the facts also seems to ignore, or at least diminish, vital context here – namely that Dr. Obaisi rarely issued waist chain permits to Plaintiff prior to the shakedown.  (*Compare* Dkt. 111 ¶¶ 16, 20 (describing the *two times* that Dr. Obaisi granted Saffold waist chain permits prior to the shakedown), *with id.* ¶¶ 14, 19, 29, 36 (indicating *seven separate occasions* that Dr. Obaisi declined to issue such permits between July 2012 and May 2016)).  Thus, Saffold typically did not have a medical permit for waist chains.  Yet he fails to allege a single instance

aside from the shakedown where the absence of waist chains led to harm, nor any other facts that would suggest to Dr. Obaisi that he medically required alternative forms of restraint. As such, this is not a situation where Dr. Obaisi inexplicably "ceased issuing" Saffold's waist chains "despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

Moreover, Saffold adduces no evidence that waist chain permits were medically indicated even *after* the shakedown – when Saffold claims his shoulder condition worsened. (Dkt. 111 ¶¶ 42, 50, 54, 59). The only waist chain permits Saffold received following the shakedown were exclusively specified for use during prison writs. (*Id.* ¶¶ 54, 64 (discussing waist chain permits issued by Dr. Obaisi and Dr. Henze in October 2017 and October 2018, respectively)). To that end, Saffold admits that his 2018 waist chain permit issued by Dr. Henze only intended to "keep [him] comfortable because transfers outside the prison take a long time" and was "*not* issued [out of] concern that if [he were] cuffed normally he would experience any type of injury." (*Id.* ¶ 64 (emphasis added)). Ultimately, then, the facts show that Saffold infrequently had active waist chain permits and his treating physicians deemed such permits to be medically unnecessary. Although Saffold now disagrees with this course of treatment, that is not enough to create an actionable Eighth Amendment issue. *See, e.g.*, *Pyles*, 771 F.3d at 409. Moreover, Saffold does not present any evidence to suggest that Dr. Obaisi's treatment fell below prevailing medical standards. *Burton*, 805 F.3d at 785; *King*, 680 F.3d at 1018–19. He has not disclosed a single doctor purporting to criticize or contradict Dr. Obaisi's treatment decisions, for instance. Conversely, Dr. Henze's position that Obaisi complied with applicable community standards of medical care in this case further instructs against a finding of deliberate indifference. (Dkt. 111 ¶¶ 73, 75; *accord* Dkt. 91-2 ¶ 78 (supporting Obaisi's judgment that "no medical evidence [showed] that Plaintiff's degenerative shoulder condition required the issuance of a waist-chain permit")).

Saffold has not produced sufficiently probative evidence that Dr. Obaisi was deliberately indifferent to Saffold's serious medical condition. Therefore, Dr. Obaisi's motion for summary judgment [90] is granted.

### 2.    IDOC Defendants

To establish liability for deliberate indifference, a plaintiff must provide evidence of the defendants' "personal involvement in the alleged constitutional deprivation." *Munson v. Gaetz*, 673 F.3d 630, 637 (7th Cir. 2012) (citing *Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008); *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000). However, "while it is true that a plaintiff must establish a defendant's personal responsibility for any claimed deprivation of a constitutional right, a defendant's direct participation in the deprivation is not required." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). The personal responsibility requirement may be satisfied where an official "acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Crowder v. Lash*, 687 F.2d 996, 1006 (7th Cir. 1982) (emphasis added). *See also Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015).

Summary judgment is appropriate in this case because Plaintiff has failed to present evidence that the IDOC Defendants' own actions or inactions resulted in his claimed injuries. *Palmer v. Marion Cty.*, 327 F.3d 588, 593–94 (7th Cir. 2003) (affirming summary judgment "in short order" where plaintiff "made no showing that [defendant] was personally involved in the [actions] allegedly amounting to a violation of [plaintiff's] constitutional rights"). To begin,

Plaintiff concedes that the IDOC Defendants did not handcuff him behind his back in the first instance. Instead, he claims that unnamed Orange Crush officers handcuffed him. (Dkt. 122 ¶ 7). To the extent that Saffold claims the IDOC Defendants' failure to act at this point somehow led to injury, his argument fails. In particular, Saffold makes much of the undisputed fact that it took two hours for a nurse to arrive after he requested medical attention or for his handcuffs to be removed. (*Id.* ¶ 8). However, Plaintiff concedes that the IDOC Defendants did in fact "sen[d] a nurse to see [him] and his handcuffs were removed." (Dkt. 110 ¶ 17). Therefore, the IDOC Defendants plainly did not fail to act in response to his request for medical attention. Further, while prisoners are entitled to adequate medical care, *Johnson v. Doughty*, 433 F.3d at 1013, they are not entitled to "unqualified access to care." *Holloway*, 700 F.3d at 1073. Saffold has not adduced evidence indicating that any delay in his seeing the nurse was so unreasonable that it amounted to a "failure to act."

Saffold also failed to proffer sufficient evidence showing that any of the IDOC Defendants were personally involved with re-handcuffing him following the nurse's visit. Plaintiff only alleged that "once the nurse left, *the guards* put the handcuffs back on." (Dkt. 122 ¶ 8 (emphasis added)). However, he failed to identify *which* guards affirmatively replaced his handcuffs, let alone provide evidence that it was any of the IDOC Defendants who did so. Review of Plaintiff's citation to the record on this point falls short of implicating the IDOC Defendants in his re-handcuffing, as well. The cited testimony reflects that the nurse told "[o]ne of them Orange Crush dudes" to remove or loosen his handcuffs; that "they" complied with that request by removing his handcuffs; and that "they" put Saffold back into the handcuffs when the nurse left. (Dkt. 94-2 at 160:22–161:7). This testimony does not establish that any of the IDOC Defendants directly participated in Saffold's re-handcuffing. Similarly, there is no evidence showing that the IDOC

28

Defendants failed to act in any injurious way once Saffold was placed back into handcuffs. *Crowder*, 687 F.2d at 1006. In one respect, Saffold failed to show that he ever again asked the IDOC Defendants to remove his handcuffs after visiting with the nurse, nor that the IDOC Defendants rejected or ignored those requests. Moreover, he failed to adduce evidence that he so much as complained to the IDOC Defendants about being re-handcuffed following the nurse's visit. Absent such facts, no reasonable juror could conclude that the IDOC Defendants failed to act in some way that caused Saffold harm. Saffold also points to nothing in the record to suggest that the nurse told the IDOC Defendants that re-handcuffing Saffold would be medically contraindicated. As such, the evidence does not indicate that the IDOC Defendants disregarded her medical judgment by allowing Saffold to be re-handcuffed. *Cf. Zentmyer v. Kendall Cty., Ill.*, 220 F.3d 805, 812 (7th Cir. 2000) ("If a defendant consciously chose to disregard a nurse or doctor's directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference.").

In sum, the record lacks sufficient evidence from which a jury could reasonably infer that the IDOC Defendants were personally involved in causing Saffold's alleged injuries. The IDOC Defendants' motion [93] is therefore granted.

## **CONCLUSION**

For the reasons set forth above, the Court grants Defendant Obaisi's and IDOC Defendants' Motions for Summary Judgment [90, 93].

Virginia M. Kendall
United States District Judge

Date: September 30, 2021

29